SOMPO JAPAN INSURANCE
COMPANY of AMERICA,
Plaintiff–Appellant,

v.

UNION PACIFIC RAILROAD
COMPANY, Defendant–
Appellee.

Docket No. 04–4066–CV.

United States Court of Appeals,
Second Circuit.

Argued: July 14, 2005.

Decided: July 10, 2006.

David T. Maloof, Maloof Browne & Eagan LLC, Rye, N.Y. (Thomas M. Eagan, on the brief), for Plaintiff–Appellant.

Barry N. Gutterman, Barry N. Gutterman & Associates, P.C., New York, N.Y. (Robert Briere, on the brief), for Defendant–Appellee.

Before: WESLEY and HALL, Circuit Judges, and TRAGER,[1] District Judge.

WESLEY, Circuit Judge:

A shipment of thirty-two tractors, en route from Tokyo, Japan to Swanee, Georgia, was severely damaged when the train carrying the cargo derailed in Texas. The cargo owner, Kubota Tractor Corporation ("Kubota"), collected the full value of the tractors—$479,500—from its insurer, Sompo Japan Insurance Co. of America ("Sompo"). Subrogating Kubota's claim, Sompo then brought this suit against defendant-appellee Union Pacific Railroad Co. ("Union Pacific" or "the Railroad") in the Southern District of New York. The district court (Duffy, J.) granted partial summary judgment in favor of Union Pacific, giving effect to the contract for carriage, which incorporates by reference the Carriage of Goods by Sea Act ("COGSA"), Pub.L. 16 No. 74–521, 49 Stat. 1207 (1936) (codified at 46 U.S.C. app. §§ 1301–1315), and effectively limits Union Pacific's liability to $500 per tractor, or $16,000. *See Sompo Japan Ins. of Am. v. Union Pac. R.R. Co.*, No. 03–1604, 2003 WL 22510361, at *4 (S.D.N.Y. Nov.5, 2003).[2]

On appeal, Sompo argues that the district court erred in finding that another

---

1. The Honorable David G. Trager, Judge of the United States District Court for the Eastern District of New York, sitting by designation.

2. After the district court denied Sompo's motion for reconsideration, the parties stipulated to a final judgment subject to Sompo's right to appeal. *See Sompo Japan Ins. of Am. v. Union Pac. R.R. Co.*, No. 03–1604, 2003 WL 22510361 (S.D.N.Y. Nov. 05, 2003); *Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.*, No. 03–1604 (S.D.N.Y. June 23, 2004).

statute, the Carmack Amendment to the Interstate Commerce Act of 1887 ("Carmack"), Act of June 29, 1906, ch. 3591, 34 Stat. 584 (1906) (current version at 49 U.S.C. § 11706), does not govern the Railroad's liability in this case. We agree and accordingly vacate the district court's order for partial summary judgment and remand this case for further proceedings.

## Background

In July 2002, Kubota hired Mitsui OSK Line Ltd. ("MOL"), an ocean shipping company, to ship thirty-two tractors from Tokyo, Japan to Swanee, Georgia. As evidence of this agreement, MOL issued three identical bills of lading, contracts that "record[ ] that a carrier has received goods from the party that wishes to ship them, state[ ] the terms of carriage, and serve[ ] as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 18, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004). The bills of lading were "through" bills: they covered the entire journey from start to finish, including both the ocean and land legs. *See id.* at 25–26, 125 S.Ct. 385. Further, they were "intermodal" through bills, meaning that they contemplated multiple modes of transportation, including ocean and rail carriage. Pursuant to the bills of lading, MOL shipped the tractors by ocean transit from Tokyo to Los Angeles, California where the cargo was then transferred from MOL's ship to MOL's subcontractor, Union Pacific,[3] for rail carriage to Georgia. Union Pacific issued electronic waybills[4] covering the rail carriage to Georgia.

While Union Pacific was transporting the cargo, the tractors were damaged in a train derailment in Texas.

In the district court, Union Pacific argued that, pursuant to the MOL bills of lading, its liability should be limited to $500 per package. In particular, Union Pacific relied upon two provisions in the bills, Clause 29 and Clause 4. Clause 29 is a "clause paramount," which identifies the law that will govern the rights and liabilities of all parties to the bill of lading. Stephen G. Wood, *Multimodal Transportation: An American Perspective on Carrier Liability and Bill of Lading Issues,* 46 Am. J. Comp. L. 403, 408 n. 37 (1998). The clause paramount in the MOL bills recognizes COGSA as the governing law for the ocean leg of the journey and further includes a "period of responsibility clause," *see id.* at 408 n. 36, a contractual provision extending COGSA's reach beyond "the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. app. § 1301(e). The period of responsibility clause in the MOL bills of lading provides that "[MOL] shall be entitled to the benefits of the defences [sic] and limitations in the U.S. COGSA, whether the loss or damage to the Goods occurs at sea or not." *Sompo,* 2003 WL 22510361, at *2 (quoting MOL bills of lading) (second alteration in *Sompo;* emphasis removed).

Clause 4 of the MOL bills of lading constitutes what is referred to as a "himalaya clause,"[5] a contractual provision "ex-

3. There is some confusion as to how exactly the rail shipment was subcontracted to Union Pacific. *See Sompo,* 2003 WL 22510361, at *1 n. 2. How the subcontract was entered is of no moment to the resolution of this appeal.

4. Like bills of lading, waybills are contracts for the carriage of goods. 1 T. SCHOENBAUM, ADMIRALTY LAW § 10–11 (4th ed.2006). But in contrast to bills of lading, waybills are nonnegotiable. *Id.*

5. The clause derives its name "from the steamship 'Himalaya' which was involved in *Adler v. Dixon,* [1955] 1 Q.B. 158 (C.A.1954)." *Toshiba Int'l Corp. v. M/V "Sea–Land Express",* 841 F.Supp. 123, 125 n. 4 (S.D.N.Y. 1994) (alteration in original).

tend[ing] to third parties the defenses, immunities, limitations or other protections a law or a bill of lading confers on a carrier." Wood, *supra*, at 408 n. 35. The himalaya clause in the MOL bills expressly authorizes MOL to subcontract the carriage of Kubota's tractors and grants all subcontractors "the benefit of all provisions herein benefiting the Carrier [MOL] as if such provisions were expressly for their benefit." *Sompo*, 2003 WL 22510361, at *2 (quoting MOL bills of lading) (emphasis removed). Combining the Clause 29 period of responsibility clause with the Clause 4 himalaya clause, Union Pacific argued that its liability as a subcontractor was limited to $500 per tractor.

The district court agreed with Union Pacific. It rejected Sompo's contention that two other federal statutes—Carmack and the Staggers Rail Act of 1980 ("Staggers"), Pub.L. No. 96–448, 94 Stat. 1895 (codified at 49 U.S.C. § 11706)—governed the liability of Union Pacific in this case. Sompo argues on appeal, as it argued below, that Carmack and Staggers together take precedence over the COGSA liability limitation that the MOL bills of lading extend to Union Pacific. Although the district court recognized that Carmack and Staggers apply in certain circumstances to impose full liability upon a rail carrier for any losses caused by the railroad, it nevertheless ruled that, because MOL employed through bills of lading containing period of responsibility and himalaya clauses, the Carmack/Staggers statutory regime was inapplicable to this case. *Sompo*, 2003 WL 22510361, at *4. We disagree. Carmack applies to the domestic rail portion of a continuous intermodal shipment originating in a foreign country, like the one at issue here. While the through bills attempt to extend COGSA's sweep inland, that contractual extension lacks the force of statute. And in our view, the intermodal through bills, written in the context of COGSA, falls short of the Staggers prerequisite for limiting a rail carrier's Carmack liability. Carmack controls; a remand is required.

## Discussion

### I. The Statutory Landscape

The issues presented in this case arise out of the confluence of two fairly complex federal statutory schemes that govern different aspects of international commerce.

### A. COGSA

COGSA "was lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924." *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 301, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959). The purpose of the Hague Rules was to establish "international uniformity in the law governing the carriage of goods by sea." Michael F. Sturley, *Uniformity in the Law Governing the Carriage of Goods By Sea*, 26 J. Mar. L. & Com. 553, 556 (1995) (hereinafter "Uniformity in the Law"). "COGSA is the culmination of a multilateral effort 'to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade....'" *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 537, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (quoting *Robert C. Herd & Co.*, 359 U.S. at 301, 79 S.Ct. 766).

COGSA establishes a negligence-based liability regime.[6] The statute also explicit-

---

6. Under COGSA, a carrier may avoid liability on a number of grounds, including "due diligence" with respect to damage caused by unseaworthiness. *See* 46 U.S.C. app. § 1304(1). With respect to damage caused by something other than unseaworthiness, the carrier can avoid liability by proving among other things that he was without actual fault

ly permits a carrier to limit its liability for loss or damage to the cargo it is carrying to $500 per "package." 46 U.S.C. app. § 1304(5).[7] A carrier cannot avail itself of the COGSA $500–per–package liability limitation unless the shipper is given a "fair opportunity" to declare a higher liability value for its cargo. *Gen. Elec. Co. v. MV Nedlloyd*, 817 F.2d 1022, 1028 (2d Cir.1987). Thus, as long as the shipper is given a fair opportunity to declare a value higher than $500 per package—the higher value need not be the full value of the goods—the carrier's maximum liability is limited to whatever value the shipper declares. If the shipper declares no value, the carrier's liability is defaulted to $500 per package. But if the carrier fails to give the shipper a fair opportunity to declare a value, then the carrier is liable for the full value of the cargo.

■ By its terms, COGSA only applies to "the period from the time when the goods are loaded on to the time when they are discharged from the ship," 46 U.S.C. app. § 1301(e), the so-called "tackle-to-tackle" period. But the statute also contemplates that parties will enter into agreements extending COGSA's terms beyond the tackle-to-tackle period:

> Nothing contained in [COGSA] shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea.

46 U.S.C. app. § 1307. Thus, COGSA does not prevent a carrier in its bill of lading from choosing "to extend the [COGSA] default rule to the entire period in which the [cargo] would be under its responsibility, including the period of the inland transport." *Kirby*, 543 U.S. at 29, 125 S.Ct. 385.

### B. The Carmack Amendment and the Staggers Rail Act of 1980

■ In 1887, Congress passed the Interstate Commerce Act ("ICA") and created the Interstate Commerce Commission ("ICC"). The ICA empowered the ICC to regulate railroad rates, a responsibility that in 1995 Congress transferred to the Surface Transportation Board ("Board"). *See* Interstate Commerce Commission Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803 (codified generally at Title 49). Congress added Carmack to the ICA in 1906, *see* Act of June 29, 1906, ch. 3591, 34 Stat. 584 (1906), in an effort "to create a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading." *Ting–Hwa Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 704 (4th Cir.1993). Carmack applies to carriage by railroad or "by railroad and water" if the carriage is "under common control, management, or arrangement for a continuous carriage or shipment," including "transportation in the United States between a place in ... the United States and a place in a foreign country." 49 U.S.C. § 10501(a). In enacting Carmack, Congress also intended "to relieve shippers of the burden of searching out a particular negligent carrier from

---

and privity and that his agents or servants were without fault or neglect. *See id.* § 1304(2)(q).

**7.** The statute itself does not define the term "package," which is a term that is largely

fact-dependent. *See* 2A–XVI BENEDICT ON ADMIRALTY § 167 (7th ed.1998). In any case, the definition of "package" is not at issue in this case.

among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698 (1950). Thus, Carmack allows a shipper to recover for damage or loss from either the delivering carrier or the carrier issuing the bill of lading or receipt.

Whereas COGSA establishes a negligence-like liability regime, Carmack "imposes something close to strict liability upon originating and delivering carriers." *Rankin v. Allstate Ins. Co.,* 336 F.3d 8, 9 (1st Cir.2003). Indeed, Carmack effectively codified the strict liability rule that governed the liability of common carriers at common law. *See Missouri Pac. R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964). Once the shipper establishes a prima facie case of Carmack liability by showing "delivery in good condition, arrival in damaged condition, and the amount of damages," *id.* at 138, 84 S.Ct. 1142; *see also* 49 U.S.C. § 14706(a)(1), the carrier is liable "for the actual loss or injury to the property" it transports, 49 U.S.C. § 14706(a)(1), unless there is an available defense.[8]

By 1976, the extensive regulatory scheme created by the ICA had prevented rail carriers from effectively competing with other modes of transportation. *See Tokio Marine & Fire Ins., Co. v. Amato Motors, Inc.,* 996 F.2d 874, 877 (7th Cir. 1993); *W. Coal Traffic League v. United States,* 694 F.2d 378, 384 (5th Cir.1982). As part of an expansive deregulation effort, Congress enacted the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (codified at 49 U.S.C. § 11706), which, among other things, authorized the

ICC "to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement." 49 U.S.C. § 10502(f). Pursuant to this authority, the ICC exempted from regulation rail carriers, like Union Pacific, that operate one leg of a continuous intermodal movement. *See* 49 C.F.R. § 1090.2.

While this exempt order relieved certain rail carriers of rate regulation, it did not free them from all legal obligations to shippers. In particular, exempt rail carriers must satisfy the requirements of 49 U.S.C. § 10502(e), which states:

> No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title. Nothing in this subsection or section 11706 of this title shall prevent rail carriers from offering alternative terms nor give the Board the authority to require any specific level of rates or services based upon the provisions of section 11706 of this title.

Section 11706 is the Carmack provision governing the liability of rail carriers. It provides, among other things, that the "rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property." 49 U.S.C. § 11706(a). Thus, exempt rail carriers, including those operating un-

---

**8.** The Supreme Court has indicated that Carmack preserved the defenses available to common carriers at common law. *See Missouri Pac. R.R.,* 377 U.S. at 137–38, 84 S.Ct. 1142. Thus, even under Carmack, a carrier is relieved of liability if it can prove (1) that it was free from negligence, and (2) that the damage to the cargo was caused by one of five excusable factors: (a) an act of God, (b) the public enemy, (c) an act of the shipper himself, (d) public authority, or (e) the inherent vice or nature of the goods. *Id.*

der an intermodal bill may limit their liability under Carmack by negotiating "alternative terms." However, the combined effect of § 10502(e) and § 11706(a) is that rail carriers that wish to limit their liability must offer the shipper the option of full Carmack coverage, which includes both the Carmack version of strict liability and full coverage for loss. *See Tokio Marine,* 996 F.2d at 879 ("rail carriers still must offer full rates"); *Am. Trucking Ass'ns, Inc. v. ICC,* 656 F.2d 1115, 1124 (5th Cir. 1981) ("the exemption does not and could not relieve rail carriers from the provisions of [§ 11706 [9]]"); *Co-operative Shippers, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.,* 613 F.Supp. 788, 791 (N.D.Ill.1985) ("[a]lthough freed from most regulation, [exempt rail carriers] are still subject to the liability provisions of [§ 11706]"), *overruled on other grounds,* 840 F.2d 447 (7th Cir.1988); *cf. Yamazen U.S.A., Inc. v. Chicago & Nw. Transp. Co.,* 790 F.2d 621, 622 (7th Cir.1986) (finding that § 11502(e), coupled with 11706(e), which states that a rail carrier or freight provider "may not provide by rule, contract, or otherwise ... a period of less than 2 years for bringing a civil action against it under this section," requires the carrier to offer the shipper a two-year filing period before offering alternative terms); *Ferrostaal, Inc. v. Union Pac. R.R. Co.,* 109 F.Supp.2d 146, 149–50 (S.D.N.Y.2000) (same). If an exempt rail carrier fails to offer the shipper the option of coverage for the actual loss or injury to the property, then the shipper may sue the carrier under Carmack. *See, e.g., Tokio Marine,* 996 F.2d at 880.

As noted above, MOL's through bills of lading gave Kubota a "fair opportunity" to declare a value for the tractors in excess of $500 per package, and Kubota declined.

Thus, MOL did all that was required under COGSA to trigger the statute's $500–per–package liability limitation. But Sompo argues forcefully on appeal that Carmack and Staggers apply to the domestic rail portion of a shipment that, like Kubota's, originates in a foreign country and travels under a through bill of lading. We therefore must decide whether Carmack applies to the inland portion of Kubota's shipment, a carriage of goods by rail shipped under a through bill of lading from a foreign country to a destination in the United States. If it does not, then the joint force of the period of responsibility and himalaya clauses will limit Union Pacific's liability to $500 per package. If, however, Carmack does apply, we must resolve a potential conflict between Carmack's possible imposition of full liability upon Union Pacific and COGSA's liability limitation incorporated by reference in MOL's bill of lading and extended to Union Pacific by virtue of the himalaya clause. If Carmack takes precedence over a contractual extension of COGSA, then we must address whether Union Pacific has complied with the requirements of Staggers so as to be permitted to limit its liability under Carmack. *See* 49 U.S.C. § 11706(c)(1), (c)(3)(A).

II. Carmack's Applicability

█ Carmack applies to common carriers "providing transportation or service subject to the jurisdiction of the [Surface Transportation] Board." 49 U.S.C. § 11706(a). The Board's jurisdiction over rail carriers applies to "transportation in the United States between a place in ... the United States and a place in a foreign country." 49 U.S.C. § 10501(a)(2)(A) & (F).

---

**9.** At the time these cases were decided, 49 U.S.C. § 11706 was codified at 49 U.S.C. § 11707.

Sompo argues that "if the domestic rail transport is part of a larger transportation originating in a foreign country, then it fits the statutory requirement that it is a shipment between a place in the United States and a foreign country, and Carmack is applicable to it." Not surprisingly, Union Pacific sees things differently: "[t]he Carmack Amendment is generally inapplicable where a through bill of lading contemplated inland transportation of goods." The parties' arguments reflect a difference of opinion in the courts regarding Carmack's applicability to a through bill of lading covering a shipment of goods originating in a foreign country. *Compare, e.g., Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.,* 213 F.3d 1118, 1119 (9th Cir.2000); *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.,* 799 F.2d 697, 698–700 (11th Cir.1986); *Berlanga v. Terrier Transp., Inc.,* 269 F.Supp.2d 821, 829–30 (N.D.Tex.2003); *Canon USA, Inc. v. Nippon Liner Sys., Ltd.,* No. 90–C–7350, 1992 WL 82509, at *6–8 (N.D.Ill.1992), *with Shao,* 986 F.2d at 701–04; *Capitol Converting Equipment, Inc. v. LEP Transp., Inc.,* 965 F.2d 391, 394–95 (7th Cir.1992); *Toshiba Int'l Corp. v. M/V "Sea–Land Express,"* 841 F.Supp. 123, 128 (S.D.N.Y. 1994). Surprisingly, this is an issue of first impression in this Circuit.

Most courts that have answered this question tend to reiterate the Eleventh Circuit's articulation of its holding in *Swift Textiles v. Watkins Lines, Inc.* that "when a shipment of foreign goods is sent to the United States with the intention that it come to final rest at a specific destination beyond its port of discharge," *Swift,* 799 F.2d at 701, as is the case with a through bill of lading, then Carmack applies *only* if there is a separate bill of lading covering the inland portion of the shipment. *See, e.g., Shao,* 986 F.2d at 703; *Capitol Converting,* 965 F.2d at 394; *Toshiba,* 841 F.Supp. at 128. We agree with *Swift's* mode of analysis but think that the court's articulated holding is fatally flawed.

*Swift* involved a shipment of textile machinery from Switzerland to LaGrange, Georgia. There was no through bill of lading. Rather, the machinery was shipped from Switzerland to Savannah, Georgia under one bill of lading and then trucked by a motor carrier from Savannah to LaGrange under a separate bill of lading. *Swift,* 799 F.2d at 698. During the Savannah–to–LaGrange leg of the journey, one of the containers housing the machinery slid off the truck, and the contents of the container was damaged. *See id.* In 1986, when the case came before the Eleventh Circuit, the ICC's jurisdiction over the shipment in question was governed by a provision that was nearly identical to that applying to rail carriers. *Compare* 49 U.S.C. § 10521(a)(1)(E) (repealed in 1995), *with* 49 U.S.C. § 10501(a)(2)(F). The provision stated that the ICC exercised jurisdiction over transportation of motor carriers "between a place in ... the United States and a place in a foreign country to the extent the transportation is in the United States." 49 U.S.C. § 10521(a)(1)(E) (repealed in 1995). The ICC had no jurisdiction, however, over a purely intrastate journey.[10]

For the court in *Swift,* there was no question that Carmack applied to the domestic leg of a shipment that began in a foreign country. Indeed, the court referred in the opinion to § 10521(a)(1)(E) as

---

10. The statute gave the ICC jurisdiction over transportation by motor carrier between "a State and a place in another State" and between "a State and another place in the same State through another State." Act to Revise the Interstate Commerce Act, Pub.L. 95–473, 92 Stat. 1337, § 10521(a)(1)(B), 1361–62 (1978). But because the entire domestic leg of the journey took place solely within one state, these provisions did not apply.

"the continuation of foreign commerce provision." *Swift*, 799 F.2d at 699. Thus, the court understood that if the shipment of goods from Switzerland to LaGrange, Georgia, was one continuous foreign shipment, then Carmack applied. However, if there were two separate shipments—one from Switzerland to Savannah and another from Savannah to LaGrange—then Carmack did not apply to the inland portion of the trip. The motor carrier urged the court to view the separate domestic bill of lading covering the inland carriage as evidence of two separate, distinct shipments. The court rejected this argument and articulated an "intent test" for determining the nature of an intermodal shipment: "[t]he nature of a shipment is not determined by a mechanical inspection of the bill of lading nor by when and to whom title passes but rather by 'the essential character of the commerce,' *United States v. Erie R.R. Co.*, 280 U.S. 98, 102, 50 S.Ct. 51, 74 L.Ed. 187 (1929), reflected by the 'intention formed prior to shipment, pursuant to which property is carried to a selected destination by a continuous or unified movement,' *Great N. Ry. Co. v. Thompson*, 222 F.Supp. 573, 582 (D.N.D. 1963) (three-judge district court)." *Swift*, 799 F.2d at 699.

Applying this intent test, the court determined that the shipment represented a "continuation of foreign commerce" and therefore Carmack applied. "There was no reason for the container to come to rest in Savannah other than for the consignee's customs broker to make arrangements for the Savannah to LaGrange leg of the journey." *Id.* at 700. It was obvious the parties "intended [the shipment] to begin in Switzerland and end in LaGrange, Georgia." *Id.* Having adopted a view of the shipment as a single continuous transport, the court considered it irrelevant that the motor carrier had issued a separate bill of lading for the final intrastate leg of the journey. Quoting the Supreme Court in *Erie Railroad*, the *Swift* court explained that the character of the shipment is "not affected by the fact that the transaction is . . . completed under a local bill of lading which is wholly intrastate. . . ." *Id.* at 700 (quoting *Erie R.R.*, 280 U.S. at 102, 50 S.Ct. 51).

Despite the clarity of *Swift's* analysis, the court muddied the waters when it articulated its holding:

> [W]hen a shipment of foreign goods is sent to the United States with the intention that it come to final rest at a specific destination beyond its port of discharge, then the domestic leg of the journey (from the port of discharge to the intended destination) will be subject to the Carmack Amendment *as long as the domestic leg is covered by separate bill or bills of lading.*

*Id.* at 701 (emphasis added). The court's statement that a domestic bill of lading is *necessary* for Carmack to apply is perplexing to say the least. Indeed, it was the separate domestic bill of lading (covering a purely intrastate journey) in *Swift* that the motor carrier employed, unsuccessfully, to argue that Carmack *did not* apply. Once the *Swift* court had determined that the parties intended a continuous shipment from the foreign place of origin to the final destination, it deemed the separate domestic bill of lading to be irrelevant. Further, the version of Carmack in force at the time of *Swift* explicitly provided that a motor (or rail) carrier's failure to issue a bill of lading did not remove the carrier from Carmack's reach, *see* 92 Stat. at 1359, 1361, 1453, and that provision still exists as to rail carriers, *see* 49 U.S.C. § 11706(a).

The disconnect between *Swift's* reasoning and the articulation of its holding has not gone unnoticed. *See, e.g., Berlanga*, 269 F.Supp.2d at 829. In fact, recognizing

the inconsistency, one court has hypothesized that *Swift's* use of the phrase "as long as" instead of "even if" was due to a typographical error. *See Canon USA,* 1992 WL 82509, at *7. We are therefore reluctant to rely on any line of precedent derived from *Swift's* articulated holding.[11]

Nevertheless, although we reject *Swift's* articulated holding, we have no hesitation about adopting *Swift's* mode of analysis for determining Carmack's applicability, and in fact we have done so before. *See Project Hope v. M/V IBN SINA,* 250 F.3d 67, 74–75 (2d Cir.2001). Under that analysis, we must first determine the nature of the shipment in question—whether it is a single continuous intermodal shipment or multiple shipments consisting of separate ocean and domestic legs. Then we must determine whether Carmack applies to the shipment at issue.

The answer to the first question is straightforward. Under the *Swift* intent test, which we applied in *Project Hope,* the domestic leg of the Kubota shipment is a continuation of foreign commerce rather than a separate and distinct interstate transport of goods. Kubota's intention that the tractors travel from Japan to Swanee, Georgia was fixed at the time the shipment began in Japan, as evidenced by the through bill of lading designating Swanee, Georgia as the final destination. The fact that Union Pacific issued separate domestic waybills does not change the nature of the shipment. *Cf. Project Hope,* 250 F.3d at 75 (collecting cases supporting the proposition that the foreign commerce nature of a shipment is not affected by the issuance of a domestic bill of lading covering intrastate transport).

While it is relatively clear that Kubota's shipment of tractors is a single continuous shipment of goods originating in a foreign country and destined for the United States, whether Carmack applies to the domestic rail portion of such a shipment is a more complicated question. To be clear, the source of the complexity is not the requirement of *Swift's* articulated holding that Carmack applies to such a shipment only if there is also a separate domestic bill of lading. As we have already explained, that requirement is nonsensical in light of *Swift's* own analysis, as well as the statute, and was likely the result of an inadvertent error. Rather, the complexity derives from the language and history of the statute itself.

---

**11.** For an illustration of the confusion caused by *Swift's* articulated holding, one need look no further than the Seventh Circuit's opinion in *Capitol Converting,* 965 F.2d at 391. In an attempt to rationalize *Swift's* articulated holding, the court in *Capitol Converting* explained that Carmack only applies to a shipment of goods originating in a foreign country if there is a "separate domestic segment," as evidenced by a separate domestic bill of lading. *Id.* at 394. But this surely cannot be the rationale underlying *Swift's* articulated holding because the *Swift* court clearly viewed the domestic transport at issue in that case as part of a single continuous shipment rather than as a separate domestic shipment. *See Swift,* 799 F.2d at 700 ("[I]t cannot be disputed that the shipment was intended to begin in Switzerland and end in LaGrange, Georgia."). Further, the *Swift* court explicitly stat-

ed that Carmack applies to such a "continuation of foreign commerce." *Id.* Moreover, had the *Swift* court viewed the domestic shipment in that case as separate and distinct from the rest of the transport, as *Capitol Converting* suggests, it would clearly have held that Carmack *did not apply* because, unlike the domestic *interstate* shipment in *Capitol Converting,* the domestic shipment in *Swift* was an *intrastate* shipment to which Carmack clearly does not apply. *Id.* at 699. Thus, *Capitol Converting's* rationalization of *Swift* is wholly unpersuasive. Regrettably, it has proven to be influential. *See, e.g., Tokio Marine & Fire Ins. Co. v. Kaisha,* 25 F.Supp.2d 1071, 1081 (C.D.Cal.1997); *N.Y. Marine & Gen. Ins. Co. v. S/S "Ming Prosperity",* 920 F.Supp. 416, 425 (S.D.N.Y.1996); *Toshiba,* 841 F.Supp. at 128.

"The starting point for [the] interpretation of a statute is always its language," *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), and "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As pertinent to this case, Carmack applies to "transportation in the United States between a place in ... the United States and a place in a foreign country." 49 U.S.C. § 10501(a)(2)(F). At first blush, the word "between" does not seem to imply a direction of travel; rather, it appears to describe simply the relationship that an object or activity bears with respect to two fixed points. Thus, the phrase "air service between the two cities" means that the air service is from one city to the other and vice versa. WEBSTER'S THIRD NEW INT'L DICTIONARY 209 (2002). Then again, the phrase "two cities" does not give priority to either of the two endpoints. Both rest on equal footing. By contrast, by providing that the Board has jurisdiction over "transportation ... between ... the United States and ... a foreign country," 49 U.S.C. § 10501(a)(2)(F), without also granting jurisdiction over transportation between a foreign country and the United States, the ICA might be read as distinguishing between exports and imports.

In a thoughtful analysis of Carmack's applicability, a Texas district court relied in part upon a comparison of prior versions of the statute to find that Carmack applies to the domestic portion of international shipments *regardless* of the direction of travel. *Berlanga*, 269 F.Supp.2d at 826–27. Prior to 1978, the statute did not include the word "between" and instead

covered the transportation of property "*from* any point in the United States *to* a point in an adjacent country." *F.J. McCarty Co. v. S. Pac. Co.*, 428 F.2d 690, 692 n. 1 (9th Cir.1970) (quoting 49 U.S.C. § 20(11)) (emphasis added). In 1978, Congress amended the Interstate Commerce Act, replacing the "from ... to" construction with the word "between." Amendments to the Interstate Commerce Act, Pub.L. No. 95–473, § 10501(a)(2)(G), 92 Stat. 1337, 1359 (1978). Employing the canon of statutory construction "requiring a change in language to be read, if possible, to have some effect," *Am. Nat'l Red Cross v. S. G.*, 505 U.S. 247, 263, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992), the court in *Berlanga* concluded that Congress, by changing this language in 1978, must have intended for Carmack's applicability to the carriage of goods traveling in foreign commerce to no longer depend upon the shipment's point of origin. 269 F.Supp.2d at 826–27.

However, the court in *Berlanga*, as well as subsequent courts, failed to notice that the 1978 amendments were adopted in a codification bill enacting the ICA into positive law, and it is well-established that courts should not "infer[ ] that Congress, in revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed." *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957). Congress expressed no such intention in the 1978 amendments. To the contrary, Congress made clear that the bill was intended to leave the law substantively unchanged. *See* H.R.Rep. No. 1395, 95th Cong., 2d Sess. 9 (1978), *reprinted in* U.S.Code Cong. & Ad. News 3009, 3018 (cited in *In re Roll Form Prods., Inc.*, 662 F.2d 150, 153 & n. 5 (2d Cir.1981)).[12]

---

**12.** In particular, Congress stated the following:    ing:

Nevertheless, judicial interpretations of this earlier version of the ICA, combined with well-settled principles of statutory construction, lead us to conclude that even the pre–1978 statute, which contained the "from … to" language, provided that Carmack applied to the transportation of goods both exiting and entering the United States. When Carmack was first enacted, it did not apply to shipments of goods destined for foreign countries but was instead limited to purely interstate commerce. *See* Act of June 29, 1906, c. 3591, 34 Stat. 593 (originally codified at 49 U.S.C. § 20(11)); *see also J.H. Hamlen & Sons Co. v. Ill. Cent. R. Co.*, 212 F. 324, 327 (E.D.Ark.1914). By contrast, the ICC's regulatory jurisdiction originally included transportation "from any place in the United States to an adjacent foreign country." Act to Regulate Commerce, Feb. 4, 1887, c. 104, 24 Stat. 379 (originally codified at 49 U.S.C. § 1). Thus, as of 1906, the ICA provision establishing the ICC's jurisdiction covered a wider swathe of common carrier transportation than under Carmack, the ICA provision establishing a common carrier's liability.

Congress eliminated that distinction in 1915 when it enacted the First Cummins Amendment, which extended Carmack's application to transportation "from any point in the United States to a point in an adjacent foreign country." Act of March 4, 1915, c. 176, 38 Stat. 1196, 1197. While the First Cummins Amendment brought certain foreign shipments within Carmack's reach, there remained a question as to the precise boundaries of the "from … to" language.

In *Galveston, Harrisburg & San Antonio Ry. Co. v. Woodbury*, 254 U.S. 357, 359–60, 41 S.Ct. 114, 65 L.Ed. 301 (1920), the Supreme Court interpreted the "from … to" language contained in the ICA's jurisdictional provision as encompassing both exports and imports. At issue in *Woodbury* was whether a railroad could avail itself of a tariff published with the ICC to limit its liability for a passenger's trunk that was lost in transit from Canada to Texas. The Court explained that even under Carmack, carriers could limit their liability by publishing a tariff with the ICC and that this rule survived the First Cummins Amendment. *Id.* at 359, 41 S.Ct. 114. The rail passenger argued that, in order to take advantage of the tariff published with the ICC, the transportation in question had to be one over which the ICC could assert its jurisdiction. *Id.* Because the transportation in question originated in Canada rather than in the United States, the rail passenger argued, the transportation was not "from any place in the United States to an adjacent foreign country," and therefore the ICC lacked jurisdiction. *Id.* The Supreme Court rejected this argument and, in what was later described euphemistically as a "prodigious feat of interpretation," Note, *Foreign Commerce and the Interstate Commerce Act*, 40 Harv. L.Rev. 1130, 1134 (1927), read the "from … to" language as conferring upon the ICC jurisdiction over transportation in

Like other codifications undertaken to enact into positive law all titles of the United States Code, this bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. This fear might have some weight if this were the usual kind of amendatory legislation where it can be inferred that a change of language is intended to change substance. In a codification statute, however, the courts uphold the contrary presumption: the statute is intended to remain substantively unchanged.

H.R.Rep. No. 1395, 95th Cong., 2d Sess. 9 (1978), *reprinted in* U.S.Code Cong. & Ad. News 3009, 3018.

foreign commerce *regardless* of whether the transportation originated in the United States or in an adjacent foreign country, *Woodbury,* 254 U.S. at 359, 41 S.Ct. 114. Writing for the Court, Justice Brandeis reasoned that "[a] carrier engaged in transportation by rail *to* an adjacent foreign country is, at least ordinarily, engaged in transportation also *from* that country to the United States." *Id.* Justice Brandeis found support for this bi-directional reading of the language in both ICC interpretations and Supreme Court cases interpreting similar language in analogous trade contexts. *See id.* at 360, 41 S.Ct. 114.

The use of similar language, let alone identical language, in two different provisions of the same statute is, as the Supreme Court has emphasized, "a strong indication that [the two provisions] should be interpreted *pari passu,*" *i.e.,* in the same manner. *Northcross v. Bd. of Ed. of Memphis City Sch.,* 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (per curiam). This principle of statutory construction holds true unless "there is strong evidence that Congress did not intend the language to be used uniformly." *Smith v. City of Jackson,* 544 U.S. 228, 261, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (O'Connor, J., concurring in the judgment); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* —— U.S. ——, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). Thus, while the *Woodbury* Court interpreted the "from ... to" language only in that section of the ICA defining the ICC's jurisdiction, one would think that the same interpretation would have applied to the identical language in Carmack. In general, however, lower courts have resisted that inclination, *see, e.g., Sklaroff v. Pennsylvania R.R. Co.,* 184 F.2d 575, 575 (3rd Cir.1950); *Strachman v. Palmer,* 177 F.2d 427, 429 (1st Cir.1949); *Condakes v. Smith,* 281 F.Supp. 1014, 1015 (D.Mass.1968), and

have tended instead to adopt the reasoning of an influential Pennsylvania Superior Court decision, *Alwine v. Pennsylvania R. Co.,* 141 Pa.Super. 558, 15 A.2d 507 (1940).

The *Alwine* court provided two rationales for its decision not to extend the *Woodbury* interpretation of the "from ... to" language of the Carmack liability provision and instead to limit that interpretation to the language in the ICC jurisdiction provision. First, the *Alwine* court noted that the ICC itself had interpreted the First Cummins Amendment as "extend[ing] the territorial application of the provisions of the Carmack amendment to ... goods *exported* to ₁adjacent foreign countries." *Id.* at 510 (quoting 52 I.C.C. 671, 683 (Apr. 14, 1919)). However, it is not clear that this quote represented the ICC's official interpretation of the ICA. And even if it was an official interpretation, the ICC did not state, and to our knowledge has never stated, that Carmack applied *exclusively* to exports.

Second, the court in *Alwine* also relied upon an inference drawn from congressional action following the *Woodbury* decision. *Id.* It explained that in *Woodbury,* after the state court's decision, which viewed the ICC jurisdiction provision as covering only exports, Congress set into motion an amendment to the ICA to make clear that the ICC had jurisdiction over the carriage of goods exported to, or imported from, an adjacent foreign country. *Id.* That amendment was finally enacted two months after the Supreme Court issued its decision in *Woodbury.* *See* Act of February 28, 1920, c. 91, 41 Stat. 456, 474. The court in *Alwine* reasoned that Congress's failure, in the course of altering the language in the jurisdiction provision, to change the parallel language in Carmack, while at the same time making other minor revisions in Carmack, *see id.* 41 Stat. at 494, supported an inference that Congress

no longer intended the two provisions to be co-extensive. *Alwine*, 15 A.2d at 510.

We are less sanguine than the *Alwine* court about the force of that inference. The Supreme Court has on numerous occasions expressed a "reluctan[ce] to draw inferences from Congress' failure to act." *Brecht v. Abrahamson*, 507 U.S. 619, 632–33, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (citing *Am. Trucking Ass'ns., Inc. v. Atchison, T. & S.F.R. Co.*, 387 U.S. 397, 416–18, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967))). That reluctance seems to be particularly apt in a case like *Alwine*, where the inference drawn would deny the effect of a Supreme Court precedent. Indeed, if anything, Congress's re-enactment of Carmack in the Act of February 28, 1920 without changing the "from ... to" language would seem to reflect a congressional intent to ratify the Supreme Court's interpretation of that language in *Woodbury*. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change ...." (quoting *Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978))). We do not think that Congress, by simply making the language of the ICC jurisdiction provision more explicit in light of the *Woodbury* Court's interpretation of that language, indicated any intent to restrict Carmack's coverage solely to exports.

Nor do we think that the Supreme Court's later decision in *Reider v. Thompson*, 339 U.S. 113, 70 S.Ct. 499, 94 L.Ed. 698 (1950), resolved the issue at hand, as the Seventh Circuit has suggested. *See Capitol Converting*, 965 F.2d at 394 (char-

acterizing *Reider* as holding that Carmack does not cover goods shipped under a through bill of lading issued in a foreign country). The issue in *Reider* was whether Carmack applied to the inland rail carriage of a shipment of goods that originated in Buenos Aires, Argentina with the final destination of Boston, by way of New Orleans, Louisiana. Importantly, the original carrier in *Reider* did not issue a through bill of lading from Buenos Aires to Boston. 339 U.S. at 117, 70 S.Ct. 499. Accordingly, the Supreme Court viewed the shipment as consisting of two distinct legs: Buenos Aires to New Orleans and New Orleans to Boston, and the Court rightly pointed out that Carmack clearly applies to the interstate leg from New Orleans to Boston. *Id.* The Court then proceeded to clarify that, because the shipment involved no through bill of lading, it would not decide whether *Alwine* was correctly decided. *See id.* at 118, 70 S.Ct. 499 ("We need not now determine whether [*Alwine*] was correctly decided. For purposes of this case it is sufficient to note that there the Pennsylvania court emphasized that the shipment came into this country on a through bill of lading from Canada. The contract of carriage did not terminate at the border, as in the instant case."). Thus, notwithstanding the Seventh Circuit's suggestion to the contrary in *Capitol Converting*, the *Reider* Court specifically reserved from its judgment the question at issue here: whether Carmack applies to the domestic rail portion of a single, continuous shipment of goods originating in a foreign country.

Where does that leave us? We know that *Woodbury* interpreted the phrase "from a place in the United States to a place in an adjacent foreign country" in the ICC jurisdiction provision as encompassing both imports and exports. As we have noted, that interpretation should also govern the "from ... to" language in Car-

mack in the absence of "strong evidence" that Congress wished for the language in the ICC jurisdiction provision to be interpreted differently from that of Carmack. *See Smith,* 544 U.S. at 261, 125 S.Ct. 1536 (O'Connor, J., concurring). Because we have found no evidence, let alone "strong evidence," of such congressional intent, we conclude that the Supreme Court's decision in *Woodbury* would have governed the interpretation of the "from . . . to" language in Carmack prior to 1978, the year that Congress enacted the ICA into positive law. Accordingly, we find that at that time, Carmack applied to the domestic portion of a transportation of goods originating outside of the United States.[13] Although we might question the basis for the *Woodbury* Court's interpretation, we cannot simply jettison a Supreme Court case because we disagree with it. "Even if a Supreme Court precedent was 'unsound when decided' . . . it remains the Supreme Court's 'prerogative alone to overrule one of its precedents.'" *Bach v. Pataki,* 408 F.3d 75, 86 (2d Cir.2005) (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 9, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (quoting *Khan v. State Oil Co.,* 93 F.3d 1358, 1363 (7th Cir.1996) (Posner, J.))). *Woodbury* has never been overruled and therefore is still good law that we are obligated to follow.

Our interpretation of Carmack—that it applies to the domestic inland portion of a foreign shipment regardless of the shipment's point of origin—also comports with Congress's view of the law when Congress codified the ICA in 1978. In the codification bill, Congress struck the "from . . . to" language from Carmack altogether and made Carmack's applicability turn on whether a "common carrier [is] providing transportation subject to the Interstate Commerce Commission." 49 U.S.C. § 11706, 92 Stat. at 1453. Thus, Congress indicated that, in order to determine Carmack's applicability, one must consult the ICC jurisdiction provision. Because the codification bill was intended to leave the substantive law unchanged, this structural re-arrangement of Carmack reflects Congress's understanding that the boundaries of Carmack's applicability have always been co-extensive with those of the ICC's jurisdiction. *Woodbury* and the Act of February 28, 1920 (ratifying the *Woodbury* interpretation) clearly establish that the ICC's jurisdiction includes transportation from a foreign country to the United States. Because the scope of the ICC jurisdiction provision is co-extensive with the scope of Carmack's applicability and

---

**13.** One could fairly raise the objection that, regardless of the proper interpretation of the "from . . . to" language in the pre-codification version of Carmack, the pre-codification version of the statute contained language making clear that Carmack only applied to international shipments of goods involving "an *adjacent* foreign country," *Berlanga,* 269 F.Supp.2d at 827 (quoting 49 U.S.C. § 20(11) (1976) (emphasis added)), and that the codification bill's omission of the word "adjacent" should not be interpreted as a change in the law. Under this objection, it would follow that Carmack does not apply in this case because the Kubota shipment involved transportation from a non-adjacent country, Japan, to Georgia. This objection, however, is foreclosed by our decision in *Project Hope.* Focus-

ing solely on the post-codification language, we held in *Project Hope* that Carmack applied to the domestic motor carriage portion of an international shipment originating in Virginia and destined for a non-adjacent country, Egypt. *See Project Hope,* 250 F.3d at 75. Although *Project Hope* involved motor, rather than rail, carriage, the post-codification language governing the Board's jurisdiction, and therefore Carmack's applicability, is identical regardless of the mode of transport. *Compare* 49 U.S.C. § 13501(1)(E) with 49 U.S.C. § 10501(2)(F). Thus, we find ourselves bound by Project Hope's holding, which effectively extended Carmack's applicability to international shipments involving non-adjacent foreign countries.

because the *Woodbury* Court interpreted the "from ... to" language as applying to goods traveling in foreign commerce regardless of direction, it follows that the "from ... to" language in Carmack also applies to goods in foreign commerce regardless of the direction of travel. We therefore conclude that Carmack applies to the domestic interstate leg of the Kubota shipment.[14]

## III. The Carmack Amendment and COGSA

■ Because the period of responsibility and himalaya clauses in MOL's through bills of lading together extend COGSA's terms to subcontractors, like Union Pacific, the fact that Carmack also applies to the Union Pacific leg of the Kubota shipment creates a potential conflict between two different liability regimes. In our view, however, the conflict is not between two federal laws but rather between one federal law (Carmack) and a contract that, although incorporating the terms of another statute (COGSA), nevertheless lacks statute-like status. Section 1307 of COGSA states:

> Nothing contained in [COGSA] shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea.

46 U.S.C. app. § 1307. Because COGSA only applies to "the period from the time when the goods are loaded on to the time when they are discharged from the ship," *id.* § 1301(e), courts have consistently held that when COGSA is extended by contract beyond the tackles, as contemplated by § 1307, the statute does not apply of its own force, or *ex proprio vigore*, but rather as a contractual term. *See Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 557 (2d Cir.2000); *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 315 (2d Cir. 1983); *Pannell v. U.S. Lines Co.*, 263 F.2d 497, 498 (2d Cir.1959); *Inst. of London Underwriters v. Sea–Land Serv., Inc.*, 881 F.2d 761, 764–66 (9th Cir.1989); *Croft & Scully Co. v. M/V SKULPTOR VUCHE-TICH*, 664 F.2d 1277, 1280 (5th Cir.1982); *Commonwealth Petrochems., Inc. v. S/S Puerto Rico*, 607 F.2d 322, 325 (4th Cir. 1979).

This view of COGSA finds further support in the fact that Congress explicitly provided that contracts extending the statute's reach in ways other than over land— in particular, contractual extensions covering trade between United States ports (or "coastwise trade")—do have statutory force. COGSA by its terms only applies to shipping "to or from ports of the United States" and is further limited to foreign trade. 46 U.S.C. app. § 1300. Shipping between the ports of a single nation falls under the jurisdiction of that nation alone and therefore does not raise the uniformity concerns the Hague Rules were intended to address. *See Commonwealth Petrochems.*, 607 F.2d at 327; *see also* Michael F. Sturley, *Proposed Amendments to the Carriage of Goods by Sea Act*, 18 Hous. J. Int'l L. 609, 622–27 (1996). In the United States, coastwise trade remains governed

---

**14.** We note that, even if we were to view Union Pacific's domestic, interstate carriage as a shipment entirely distinct from the rest of the transport, Carmack would still apply by virtue of 49 U.S.C. § 10501(a)(2)(A), because the Union Pacific waybill covers the interstate carriage of goods.

by the Harter Act.[15] Although COGSA left the Harter Act's application to domestic shipping largely unaffected, Congress created in COGSA what has become known as the "coastwise option," which authorizes carriers and shippers in domestic trade to, in effect, contractually opt out of the Harter Act and into the COGSA regime, as long as they do so with an "express statement." 46 U.S.C. app. § 1312; *see also* 2A–V BENEDICT ON ADMIRALTY § 42 (7th ed.1998). Thus, there is little dispute that Congress intended for certain contracts extending COGSA's reach to supersede prevailing federal statutes.

■ However, Congress made an important textual distinction between contracts extending the statute's terms to coastwise trade under § 1312 and contracts extending COGSA's terms beyond the tackles, pursuant to § 1307. With respect to contracts under the coastwise option, Congress made clear that such contracts "shall be subjected [to COGSA] as fully as if subject... by the express provisions of [the statute]." 46 U.S.C. app. § 1312. Thus, when extended by contract to cover coastwise trade, COGSA does indeed act *ex proprio vigore*.[16] However, with respect to period of responsibility

**15.** Enacted in 1898, the Harter Act imposes a duty of "proper loading, stowage, custody, care, [and] proper delivery." 46 U.S.C. app. § 190. It prohibits any exculpation clause in a bill of lading or shipping document relieving the carrier from liability arising out of negligence or fault in loading, stowage, custody, care, delivery of cargo, and the provision of a properly equipped and seaworthy vessel. *See* 46 U.S.C. app. §§ 190, 191. Like COGSA, the Harter Act also provides for exoneration of the carrier in certain circumstances, including "errors of navigation," "dangers of the sea," and "acts of God." 46 U.S.C. app. § 192. Although COGSA superseded the Harter Act with respect to the tackle-to-tackle period of international shipments, the Harter Act nevertheless continues to govern the carrier's duties in international shipments prior to the time when the goods are loaded on the ship and after the time they are discharged from the ship, until "proper delivery." *See Wemhoener Pressen v. Ceres Marine Terminals, Inc.,* 5 F.3d 734, 741–42 (4th Cir.1993) ("['Proper delivery' includes] actual or constructive delivery. Actual delivery consists [of] completely transferring the possession and control of the goods from the vessel to the consignee or his agent. Constructive delivery occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods or put them under proper care and custody." (quoting *B. Elliott (Canada) Ltd. v. John T. Clark & Son,* 704 F.2d 1305, 1308 (4th Cir. 1983) (in turn quoting *Orient Overseas Line v. Globemaster Baltimore, Inc.,* 33 Md.App. 372,

365 A.2d 325, 335–36 (1976)))). "It is clear from the legislative history that Congress intended the Harter Act to continue to apply to all cases not governed by COGSA." 2A–II BENEDICT ON ADMIRALTY § 14 (7th ed.1998). Because COGSA only applies to the tackle-to-tackle period in international shipments, *see* 46 U.S.C. app. § 1300 ("Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, *in foreign trade,* shall have effect subject to the provisions of this Act." (emphasis added)), the Harter Act continues to apply to trade between United States ports. *Id.* Similarly, because COGSA specifically exempts from its coverage goods stored on the deck of a ship, *see* 46 U.S.C. app. § 1304, courts have also held that the Harter Act applies to damage to goods in international trade during the tackle-to-tackle period, as long as the goods were carried on deck, *see, e.g., Blanchard Lumber Co. v. S.S. Anthony II,* 259 F.Supp. 857, 865 (S.D.N.Y.1966).

**16.** Accordingly, the First and Ninth Circuits, along with the Southern District of New York, have held that COGSA applies with the force of statute when a bill of lading in domestic trade incorporates COGSA's terms with an "express statement." *Hanover Ins. Co. v. Shulman Transp. Enters., Inc.,* 581 F.2d 268, 270 & n. 2 (1st Cir.1978); *Pan Am. World Airways v. Cal. Stevedore & Ballast Co.,* 559 F.2d 1173, 1175 n. 3 (9th Cir.1977) (per curiam); *Orion Ins. Co. v. M/V "Humacao",* 851 F.Supp. 575, 578 (S.D.N.Y.1994); *Watermill Export, Inc. v. MV Ponce,* 506 F.Supp. 612,

provisions, like the one in the MOL bills of lading, Congress simply stated that "[n]othing [in COGSA] shall prevent a carrier or a shipper from entering into any [such] agreement." *Id.* § 1307. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972) (alteration in original)). Therefore, that Congress, in enacting § 1307, omitted language similar to the language in § 1312 is persuasive evidence that Congress did not wish for period of responsibility clauses to have the force of statute with the capability to supersede federal law.

In light of the contractual nature of period of responsibility provisions, courts have routinely held that contracts extending COGSA beyond the tackles must give way to conflicting law. *See Colgate Palmolive,* 724 F.2d at 315–16 (refusing to apply COGSA $500–per–package limitation in view of governing state law because "provisions of COGSA incorporated by contract can be valid only insofar as they do not conflict with applicable state law"); *Wemhoener Pressen v. Ceres Marine Terminals, Inc.,* 5 F.3d 734, 739 (4th Cir.1993) ("To portions of the carriage that take

place prior to loading or after discharge and therefore are not covered by the terms of COGSA, the Harter Act controls."); *Uncle Ben's Int'l Div. of Uncle Ben's, Inc. v. Hapag–Lloyd Aktiengesellschaft,* 855 F.2d 215, 217 (5th Cir.1988) (holding that "[i]f the parties extend the provisions of COGSA to the preloading phase, any inconsistency with the Harter Act must yield to the Harter Act" but finding that the contractual incorporation of COGSA's one-year statute of limitation was not inconsistent with the Harter Act); *Toshiba Int'l Corp.,* 841 F.Supp. at 128 (suggesting that if Carmack applied to the inland portion of the journey, it would disallow the COGSA liability limitations incorporated by contract).[17]   *But see Schramm, Inc. v. Shipco Transp., Inc.,* 364 F.3d 560, 565 (4th Cir.2004) (assuming without discussion that a contract incorporating COGSA's terms wins out over any conflict with the Harter Act).

In fact, in cases involving foreign trade where there is a conflict between a period of responsibility clause and the Harter Act—which, in international shipments, applies from the time when the goods are unloaded until "proper delivery"—the principal issue is not whether a contract incorporating COGSA's terms must give way to conflicting provisions in the Harter Act, but rather whether there is in fact a conflict. "Because COGSA and the Harter Act are so similar, it often makes no differ-

614–15 (S.D.N.Y.1981). The Fourth and Fifth Circuits, on the other hand, have held that, notwithstanding § 1312's language to the contrary, COGSA applies simply as a contractual term even when extended to domestic bills of lading. *Commonwealth Petrochems.,* 607 F.2d at 326–27; *Ralston Purina Co. v. Barge Juneau & Gulf Caribbean Marine Lines, Inc.,* 619 F.2d 374, 375–76 (5th Cir.1980) (per curiam). *But see Burdines, Inc. v. Pan–Atlantic S.S. Corp.,* 199 F.2d 571, 573 (5th Cir. 1952).

**17.** In *Norfolk Southern Ry. Co. v. Kirby,* the Supreme Court held that a through bill of lading consisting of a "substantial" sea component is governed by federal law, even if the bill covers inland carriage. 543 U.S. at 27, 125 S.Ct. 385. Thus, *Kirby* would appear to effectively overrule those cases, like *Colgate Palmolive,* that hold that contracts extending COGSA's terms beyond the tackles must yield to conflicting state law, *but only to the extent that the bills of lading in those cases consist of a sea component that is "substantial."*

ence which statute applies." 2A–II BENEDICT ON ADMIRALTY § 14 (7th ed.1998). Nevertheless, when courts have identified inconsistencies between the two statutes, they have held that the Harter Act supersedes the period of responsibility clause. For example, in *R.L. Pritchard & Co. v. S.S. Hellenic Laurel*, 342 F.Supp. 388, 391 (S.D.N.Y.1972), one of our district court's noted that "[i]nsofar as the provisions of COGSA are inconsistent with the Harter Act, they cannot be incorporated into a bill of lading to cover the responsibilities of the carrier after discharge and before delivery of the cargo." *Id.* at 391. The court held that the "fire exemption" provision of COGSA, 49 U.S.C. § 1304(2)(b)—under which the carrier is liable for losses due to fire only if caused by certain types of negligence is inconsistent with the Harter Act and therefore "null and void." *R.L. Pritchard & Co.*, 342 F.Supp. at 391. Similarly, in *United States v. Ultramar Shipping Co.*, 685 F.Supp. 887 (S.D.N.Y.1987), the court found that the carrier's burden of proof for demonstrating due diligence in assuring seaworthiness is more relaxed under COGSA than under the Harter Act. *See id.* at 894–95. Accordingly, the court held that the period of responsibility clause must yield to the Harter Act. Finally, in *Birdsall, Inc. v. Tramore Trading Co.*, 771 F.Supp. 1193, 1199 (S.D.Fla.1991), the United States District Court for the Southern District of Florida held that COGSA's statute of limitations cannot supersede the absence of such a limitation in the Harter Act for the pre- and post-loading phases. *See id.* at 896.

These cases are consistent with the policy motivating COGSA. The driving force behind COGSA was a need for uniformity in the law governing the contracts central to maritime commerce. *See Vimar Seguros y Reaseguros, S.A.*, 515 U.S. at 537, 115 S.Ct. 2322. Uniformity was considered necessary to minimize the costs arising in maritime transactions that touch the shores of, and involve parties haling from, the numerous maritime nations. For the carriers, shippers, insurers, cargo underwriters, and financial intermediaries involved in these transactions, this harmonization of the law governing the agreements that drive international shipping eliminated much of the uncertainty and unpredictability that prevailed before the adoption of the Hague Rules and COGSA, when a party would not know before the fact which law would control in the event of a lawsuit under the bill of lading. However, the Hague Rules (and by extension COGSA) only sought to achieve uniformity in the law governing the international carriage of goods *by sea*. Other types of carriage, including land-based carriage, were to be governed by the law of the individual nations that participated in the international convention at the Hague. *See* Sturley, *Uniformity in the Law, supra*, at 573–74. The United States' decision to preserve the application of the Harter Act did not "sacrifice international uniformity for the simple reason that the international community made no effort to establish a uniform rule" governing the carriage of goods outside of the tackle-to-tackle period. *Id.*

Consistent with the treaty's intent, Congress specifically provided in COGSA that the statute would have no effect upon laws applying to the inland carriage of goods:

Nothing in [COGSA] shall be construed as superseding any part of [the Harter Act], or of any other law which would be applicable in the absence of [COGSA], insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship.

46 U.S.C. app. § 1311. As Senator White explained in the Commerce Committee's report of the bill to Congress, "[COGSA] supersedes the so-called 'Harter Act' from the time the goods are loaded on the ship to the time they are discharged from the ship. Otherwise our law remains precisely as it is, unaffected and unimpaired by the proposed legislation." 1 Legislative History of the Carriage of Goods by Sea Act and the Travaux Préparatoires of the Hague Rules, at 589 (Michael F. Sturley ed., 1990). Although § 1311 makes specific reference to the Harter Act, it also preserves from COGSA's reach *"any other law* which would be applicable in the absence of [COGSA], insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship." 46 U.S.C. app. § 1311 (emphasis added). Carmack is such a law. Accordingly, we hold that the contractual provision extending COGSA's terms inland must yield to Carmack. Therefore, we hold that Carmack governs Union Pacific's liability in this case.

Union Pacific would have us rely upon the Supreme Court's recent decision in *Norfolk Southern Railway Co. v. Kirby,* 543 U.S. 14, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004), but *Kirby* does not alter our analysis. In *Kirby,* the Supreme Court held that federal law should govern the interpretation of a through bill of lading consisting of sea and land portions, as long as the sea portions are "substantial." *Id.* at 27, 125 S.Ct. 385. The shipper, Kirby, had

hired a freight forwarder to arrange for the shipment of machinery from Switzerland to Huntsville, Alabama. The freight forwarder hired a German ocean shipping company to transport the cargo, and the ocean shipping company then contracted with a railroad, Norfolk Southern, to carry the goods by rail from the port of discharge—Savannah, Georgia—to the final destination, Huntsville, Alabama. *See id.* at 19, 125 S.Ct. 385. The bill of lading between the ocean shipping company and Norfolk Southern contained a period of responsibility clause and a himalaya clause conferring the benefit of COGSA's $500–per–package liability limitation on independent contractors, like Norfolk Southern. *See id.* at 19–20, 125 S.Ct. 385. When the goods were damaged after the train derailed en route to Huntsville, Norfolk Southern claimed that its liability was limited to $500 per package, as provided for in the bill of lading.[18] The cargo owner, Kirby, argued that the period of responsibility clause should be interpreted in light of state agency law principles, in which case the railroad was not entitled to benefit from the himalaya clause because the freight forwarder was not acting as Kirby's agent when it received the ocean shipping company's bill of lading. *Id.* at 22, 125 S.Ct. 385.

The Supreme Court found that the bill of lading, although covering carriage by both sea and land, was nevertheless a maritime contract to which federal law applied. *See id.* at 23–27, 125 S.Ct. 385. Adopting a conceptual approach, the Court stated

---

**18.** Norfolk Southern also sought to insulate itself by relying on the himalaya clause in the bill of lading between the freight forwarder and the ocean shipping company. However, the interpretation of that himalaya clause raised the question of the meaning of Supreme Court precedent rather than which law, federal or state, to apply. *See Kirby,* 543 U.S. at 30, 125 S.Ct. 385 (explaining that the

interpretation "turns only on whether the Eleventh Circuit correctly applied this Court's decision in *Robert C. Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959)"). Thus, it is less relevant to our discussion here, which is concerned with the correct law to apply when federal laws conflict with a contract extending COGSA's reach.

that "so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract ... [even if] it also provides for some land carriage.... If a bill's *sea* components are insubstantial, [however,] then the bill is not a maritime contract." *Id.* at 27, 125 S.Ct. 385. The Court further explained that in applying federal law, it was avoiding the "[c]onfusion and inefficiency [that] will inevitably result if more than one body of law governs a given contract's meaning," *id.* at 29, 125 S.Ct. 385, and thereby was promoting "the uniformity of general maritime law," *id.* at 28, 125 S.Ct. 385. The Court noted that in applying a single body of law to the contract, it was also "reinforc[ing] the liability regime Congress established in COGSA." *Id.* at 29, 125 S.Ct. 385.

Union Pacific contends that the same concern for uniformity and consistency in interpreting international maritime contracts "demands that provisions of 'through bills of lading' which extend limitations of liability to inland carriers should be analyzed under COGSA and not the Carmack Amendment." We cannot read *Kirby* so broadly. In *Kirby*, the Court was primarily concerned with the lack of uniformity and consistency that would result if *state* law were applied to contracts extending COGSA's terms inland. That is a significant concern, especially for the myriad parties potentially responsible for an inland carrier's damage to goods who cannot know before the fact which state law might define the contours of their liability. The Supreme Court's decision that national law will govern the interpretation of an international bill of lading with a substantial sea component adroitly avoids that problem.

■ However, in *Kirby*, the cargo owner failed to raise the issue of Carmack's applicability. *See* Brief for the United States as *Amicus Curiae* at 12, *Norfolk So. Ry. Co. v. Kirby*, 543 U.S. 14, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (No. 02–1028), 2003 WL 22762727. Therefore the only issue before the Court was the interaction between *state* law and contractual provisions extending COGSA's terms to a rail carrier. Consequently, *Kirby* only established the principle that maritime contracts should be interpreted in light of federal maritime law. Notwithstanding Union Pacific's argument to the contrary, it does not follow from that principle that the only federal law to apply is COGSA. Nor can we accept the argument that Carmack—what Union Pacific refers to as a "non-maritime federal law"—cannot play a role in governing the terms of the domestic carriage portion of a maritime contract. Federal maritime law consists of both federal common law and federal statutes. Although federal common law plays a more prominent role in the maritime context than in others, where it remains largely interstitial, it nevertheless only applies in the absence of a relevant statute. *See, e.g., E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) ("Absent a relevant statute, the general maritime law, as developed by the judiciary, applies."). What constitutes a relevant federal statute is determined solely by whether a given statute applies by its own terms to a particular set of facts. There is no additional requirement that only those federal statutes that a court deems "inherently maritime" can govern the interpretation of a maritime contract.

To apply COGSA here to the exclusion of Carmack would be to contradict well-established circuit precedent holding that period of responsibility provisions do not have statute-like status and would undermine the text of the statute itself, which

explicitly states that COGSA does not affect laws governing the carriage of goods prior to loading and after discharge. 49 U.S.C. app. § 1311.[19] We cannot interpret the *Kirby* Court's language concerning the policy underlying COGSA—language that at most merely supported, but was far from central, to the Court's holding that federal law should apply instead of *state* law—as implying that a contract extending COGSA inland should supersede an otherwise applicable *federal* law. Without further guidance from the Supreme Court or from Congress, we must rely on precedent and the plain language of the statutory scheme.

IV. Compliance with the Carmack Amendment and the Staggers Rail Act

Now that we have determined that Carmack applies to the domestic rail portion of an international shipment originating in a foreign country and traveling under a through bill of lading, even where the parties have extended COGSA's liability provisions to domestic rail carriers, one question remains: when Union Pacific negotiated the applicable terms of carriage of Kubota's tractors, did it provide the shipper an opportunity, consistent with Staggers, *see* 49 U.S.C. §§ 10502(e); 11706(a), (c)(3), to receive full Carmack liability coverage as well as "alternative terms"? If so, then under Carmack and Staggers, *see* 49 U.S.C. § 11706(c)(3), such alternative terms would *circumscribe* Union Pacific's liability. If not, and in the absence of any other defense, then Union Pacific, having failed to comply with the Carmack and Staggers requirements, would be liable for the full value of the tractors. Because the district court determined that COGSA, rather than Carmack, applied to the Kubota shipment, it did not have the opportunity to address whether Union Pacific satisfied Staggers. Moreover, the question of whether Union Pacific satisfied Staggers raises potential issues of fact and law that the district court, in the first instance, is in a better position to evaluate than are we. Accordingly, we find it prudent to remand the case to the district court to address whether Union Pacific satisfied the requirements of 49 U.S.C. § 10502(e).

■ We see no reason, however, to refrain from addressing Union Pacific's argument, advanced on appeal, that the MOL bills of lading satisfy Staggers. Union Pacific urges us to view the $500–per-package liability limitation in the MOL bills of lading as "alternative terms" and contends that Clause 29(2) of the MOL bills "gave Kubota the opportunity to declare the full value of the cargo and receive full value coverage as required by 49 U.S.C. § 11706." Clause 29(2) provides:

If the US COGSA applies as Clause 29(1) above, neither the Carrier nor the Vessel shall, in any event, be or become liable for any loss or damage to or in connection with the Goods in an amount exceeding $500.00 per package, lawful

---

**19.** Section 1311 was irrelevant to the Court's analysis in *Kirby*. Once again, § 1311 states: Nothing in [COGSA] shall be construed as superseding any part of [the Harter Act], or of *any other law which would be applicable in the absence of [COGSA],* insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship.

46 U.S.C. app. § 1311. Once the *Kirby* Court had determined that federal, not state, law governed the bill of lading, state law would not have been "applicable in the absence of [COGSA]," and therefore § 1311 did not require that the period of responsibility provision yield to state law.

money of the United States or in the case of Goods not shipped in packages, per customary freight unit, unless the value of the Goods has been declared and inserted in the declared value box on the face hereof, in which case Clause 6(2) shall apply.

Union Pacific's argument is without merit because, although Clause 29(2) provides the option of full coverage under COGSA, it does not provide the option of full coverage under Carmack. Of course, substituting the liability scheme available under COGSA for that available under Carmack might be a harmless error if the liability rules under COGSA and Carmack were identical. But as discussed above, COGSA liability is grounded in negligence while Carmack liability is rooted in strict liability. Thus, Union Pacific's argument that it is liable under either COGSA's or Carmack's standard of care misses the point. Because COGSA and Carmack create two different liability standards, we cannot assume that the shipper contracting with Union Pacific had the opportunity to choose among several types of liability coverage and opted not to pay a higher freight rate for full coverage under a strict liability rule.

While we hold that the MOL bills of lading do not satisfy Staggers, we express no opinion as to any other potential contention that Union Pacific complied with the requirements of Carmack and Staggers.

### Conclusion

For the foregoing reasons, we conclude that Carmack governs Union Pacific's liability in this case. We further conclude that the MOL bills of lading do not satisfy the Staggers requirement that the shipper be given an opportunity to receive full Carmack liability coverage before accepting alternative terms. We remand this case to the district court to consider any other potential arguments that Union Pacific might raise that it complied with the requirements of Carmack and Staggers. Accordingly, we vacate the judgment of the district court and remand the case to the court for further proceedings consistent with this opinion.