**MITSUI SUMITOMO INSURANCE CO., LTD., Plaintiff,**

v.

**EVERGREEN MARINE CORPORATION; Union Pacific Railroad Company, Defendants.**

**No. 07 Civ. 3874 (CM).**

United States District Court, S.D. New York.

Sept. 22, 2008.

---

576

David L. Mazaroli, New York, NY, for Plaintiff.

Barry N. Gutterman, New York, NY, for Defendants.

MEMORANDUM DECISION AND OR-
DER GRANTING PLAINTIFF'S
MOTION FOR PARTIAL SUM-
MARY JUDGMENT AND DENY-
ING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON
THEIR LIMITATION OF LIABILI-
TY DEFENSE

McMAHON, District Judge:

Plaintiff Mitsui Sumitomo Insurance Co. Ltd. moves for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting summary judgment on the issue of whether the so-called "Carmack Amendment" to the Interstate Commerce Act of 1887, 49 U.S.C. § 11706, renders defendants Evergreen Marine Corporation and Union Pacific Railroad Company liable for the full loss sustained when a Union Pacific train carrying cargo from Shimuzu, Japan to Statesville, North Carolina derailed. Mitsui also seeks summary judgment dismissing any affirmative defenses asserted by either Evergreen or UP that seek to limit what would otherwise be their liability under the Carmack Amendment.

UP and Evergreen cross move for summary judgment upholding their limitation of liability affirmative defense.

Mitsui's motion is granted. Defendants' cross motion for summary judgment on their limitation of liability defense is denied.

### Relevant Facts

The following facts are undisputed.

In March 2006, Evergreen was hired to transport a 165 ton shipment of automotive parts and motors from Shimuzu, Japan to Statesville, North Carolina. The FOB purchaser was Asmo North Carolina, Inc. (Asmo), which is plaintiff's subrogor.

Evergreen issued a through sea waybill EISU025643005523, which covered the entire transport from start to finish, including the ocean and land legs of the journey. The waybill was an "intermodal through bill," which means that it contemplated multiple modes of transportation—ocean carriage from Japan to the United States, followed by interstate rail carriage from the port of discharge to the final destination.

The through waybill does not mention the Carmack Amendment or Carmack liability. However, it expressly provides that the carrier's liability is limited to $500 per package unless the shipper declares a higher value and pays additional freight charges. It further provides that, where the law precludes application of the Carrier of Goods at Sea Act (COGSA) package limit, the carrier's liability is limited to 2 special drawing rights (SDRs) per kilo of gross weight of lost or damaged cargo.

Specifically, the reverse side of the sea waybill provides, at Section 5A: "Notwithstanding anything to the contrary, if the carriage called for in the Bill is a shipment to or from the United States, the liability of the Carrier or its Sub-contractor shall be exclusively determined pursuant to

COGSA which is contractually incorporated into this Bill." And at Section 5B: "Where loss or damage has occurred .... during any prior or subsequent period of carriage by Underlying Carriers or period of custody by Sub–Contractors, the liability of the Carrier shall be determined .... as provided in the provisions of Clause 5A .... of this Bill"—i.e., by reference to COGSA. In the event that Section 5B is found to be inapplicable to through transportation "from, to or within the United States," Section 5C(2) provides that "Carrier's liability will be governed by and subject to the terms and conditions of the Sub-contractor's bill of lading or waybill and/or the ICC Uniform Bill of Lading together with the Subcontractor's Tariff which shall be incorporated herein as if set forth at length." And "in the event there is a private contract between" Evergreen and any sub-contractor dealing with any portion of the shipment, Section 5D purports to limit the liability of the Carrier, in that it "shall under no circumstances whatsoever be greater than that of the Sub-contractor [UP] under said Sub-contractors' contract with the Carrier."

Section 7(2) of the reverse side of the waybill provides as follows: "The Merchant .... acknowledges .... that higher compensation than that provided herein may not be claimed unless the nature and value of such Goods* [sic] have been declared by the Merchant before shipment and agreed to by the Carrier and inserted in this Bill and any applicable Ad Valorem freight rate, as set out in Carrier's tariff, is paid." Asmo did not declare the nature and value of the goods pursuant to this section and did not pay the applicable Ad Valoren rate. (Kuo Aff. ¶ 8). There is no evidence that Asmo was offered a choice among specific alternative rates with respect to the rail portion of the intermodal

shipment, and the freight rates were "confidential." (*Pl. Rule 56.1 Statement* ¶ 78).

The sea waybill does not disclose the existence or terms of any agreement between Evergreen and UP.

Evergreen provided shipping containers TRIU5559381 and UGMU8062299 for the intermodal transport and carried the shipment loaded in those containers from Shimuzu to Los Angeles aboard one of its ships.

The ocean carriage approximated 5,400 miles.

Evergreen subcontracted with UP for the overland portion of the shipment. The subcontract between Evergreen and UP was arranged pursuant to UP's Exempt Rail Transportation Agreement (ERTA). The ERTA between the two shipping companies was not specific to the transaction at bar; rather, it provided for the transportation of all intermodal containers tendered by Evergreen to UP for rail transport.

The ERTA is a contract between UP and Evergreen. Asmo is not a party thereto.

The ERTA specified that UP's then-applicable Exempt Circular Master Intermodal Transportation Agreement (MITA–2A) would apply to the shipment.

The MITA–2A provides that it was made pursuant to 49 U.S.C. section 10709, which was enacted in 1996, and which provides, in pertinent part:

> (b) A party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract.
>
> (c)(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to

[Title 49 Subtitle IV Part A of the Interstate Commerce Act]. . . .

The Carmack Amendment, 49 U.S.C. § 11706, is in Subtitle IV Part A of the Interstate Commerce Act.

MITA 2–A expressly states, "Carmack liability coverage is not available for shipments that originate outside the borders of the United States of America."

MITA 2–A, Paragraph O, states that "Shipper" (Evergreen) must notify any and all parties involved in the transaction of all the provisions, restrictions and limitations contained in the MITA.

The Evergreen sea waybill does not expressly refer to the ERTA, the MITA 2–A, or 49 U.S.C. § 10709, or to any of their provisions.

There is no other evidence in the record suggesting that Evergreen made Asmo aware of any of the provisions, restrictions and limitations contained in the MITA 2–A, or in the ERTA. In fact, the ERTA contains a nondisclosure provision.

At Los Angeles, the shipment was transferred to a UP train for the rail segment of the intermodal transport. The train was a "dedicated" train, loaded by Evergreen and carrying only Evergreen shipments.

UP formulated electronic waybills for the rail portion of the shipment. These remained in electronic form and were not issued or otherwise transmitted to the shipper, consignee or owner of the cargo.

The UP train derailed near Nigginson, Arkansas, en route to North Carolina, causing damage and loss to the shipment as well as to other cargoes. As a result, Asmo sustained damages. Mitsui paid Asmo's insurance claim in the amount of $385,105.70 and commenced this action against Evergreen and UP.

UP has admitted liability to plaintiff for the damage to the shipment caused by the derailment and has assumed the defense of Evergreen. The only live issue in this case is the amount of damages owed—$385,105.70 or some lesser amount.

**The Parties' Positions**

The issues that are raised by the pending motions are (1) whether, under current federal law, Evergreen and UP managed to extend their limitation of liability under the Carriage of Goods and Sea Act (COGSA) to the overland portion of the transportation contract; and (2) whether Evergreen is covered by or exempt from Carmack if it applies in this case.

Mitsui argues that liability for the loss is governed by the Carmack Amendment, which overrides the parties' purported extension of COGSA's limitation of liability ($500 per package) to the overland portion of the intermodal trip. It is possible to limit liability under the Carmack Amendment if that statute applies, but only by complying with statutory conditions precedent—which Mitsui argues were not complied with here. Specifically, Mitsui argues that offering Asmo the option to ship under a full liability rate is not equivalent to offering Carmack coverage.

Evergreen and UP argue that Carmack does not apply to this shipment, because the underlying contract between them (to which Asmo is not a party) is explicitly governed by a provision of the Interstate Commerce Act (§ 10709) that exempts such shipments from Carmack. Defendants further argue that, as a result, one of two limitations of liability—either $500 per package under COGSA, or the special limitation of liability found in the waybill—limits their liability for damages. Finally,

if Carmack does apply to the rail portion of this shipment, defendants argue that they complied with the condition precedent by offering Asmo the option to ship full liability.

Evergreen also argues that Carmack cannot apply to it, because it is not a "rail carrier" subject to the Interstate Commerce Act.

The parties have cross-moved for summary judgment on all these issues.

**The Relevant Law**

The interrelationship between the Carriers of Goods at Sea Act (COGSA) and the Interstate Commerce Act—particularly as concerns limitations of liability—has been the subject of considerable litigation in recent years, in this Circuit and in the United States Supreme Court. All those decisions have not made this arcane area of law any easier to understand.

The Carmack Amendment provides that a rail carrier is liable for the actual damage to property it transports by rail. 49 U.S.C. § 11706(a). Carmack has been held to cover "the inland [rail] leg of an overseas shipment conducted under a single 'through' bill of lading." *Sompo Japan Ins. Co. v. Norfolk S. Ry. Co.*, 540 F.Supp.2d 486, 492 (S.D.N.Y.2008) (hereinafter, "*Sompo II*") (quoting *Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118, 1119 (9th Cir. 2000)).

In 1980, Congress passed the so-called Staggers Act, which amended the Interstate Commerce Act by, inter alia, permitting the Interstate Commerce Commission (now the Surface Transportation Board, or STB [1]) to exempt persons, classes of persons and transactions or services in certain circumstances. Section 10502 of Title 49

---

**1.** To avoid confusion, the court will refer to the current regulatory body throughout, even though the regulatory batton was passed from the ICC to the STB years after Staggers became law.

of the United States Code confers on the STB the relevant grant of authority to exempt a carrier. Of particular note for the purposes of this case, which involves intermodal transportation of goods, § 10502(f) authorizes the STB to "exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement" from the jurisdiction of the Board.

However, Congress's grant of authority to the STB was not plenary; it specifically refused to allow the STB to issue an exemption order that would "relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are [in]consistent with the provisions of section 11706 of this title." 49 U.S.C. § 10502(e). Put otherwise, it declined to authorize the STB to issue an order that allowed a carrier to get out of its obligations under Carmack.

■ Thus, pursuant to § 10502, rail carriers can limit their liability by contracting out of Carmack's provisions, in whole or in part. However, in order to accomplish this end, rail carriers must offer the shipper the option of full "Carmack liability" coverage, as well as alternative, non-Carmack coverage. "Courts have concluded that .... the combined effect of Section 10502(e) and Section 11706(a) is that rail carriers that wish to limit their liability must offer the shipper the option of full Carmack coverage, which includes both the Carmack version of strict liability and full coverage for loss." *Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.*, 456 F.3d 54, 59–60 (2d Cir.2006) (hereinafter, "*Sompo I*"). If the carrier fails to offer the shipper this option, then any purported limitation of liability for rail shipment is invalid, and the shipper may sue the carrier and receive full compensation for losses pursuant to Carmack.

In *Sompo I*, the Second Circuit held that the Carmack Amendment "applies to the domestic rail portion of an international shipment originating in a foreign country and traveling under a through bill of lading, *even where the parties have*" attempted to limit the carrier's liability for the shipment by extending the limitation of liability found in another federal statute— the COGSA. *Id.* at 75 (Emphasis added). Since the loss here occurred on the domestic rail portion of an international shipment originating in a foreign country and traveling under a through bill of lading, *Sompo I* appears to dictate the result in this case, at least as to UP.

Defendants argue that the Second Circuit's decision in *Sompo I* conflicts with an earlier United States Supreme Court decision, *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 28, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004). In *Kirby*, the Supreme Court ruled that COGSA's limitation of liability would be enforced on the inland portion of an international shipment, even when such limitation of liability was contrary to *state* liability law. The Court held that state law was inapplicable to a maritime shipping contract, which by tradition fell into the exclusive province of federal law.

However, in *Sompo I*, the Second Circuit rejected this very argument, concluding that *Kirby* could be distinguished because it did not address the precise question that was before the Second Circuit in *Sompo I*. That question—the applicability of the Carmack Amendment, or any other *federal* (as opposed to state) law, to the overland portion of an intermodal shipment originating abroad— was not argued to the Supreme Court in *Kirby*. As a result, the Supreme Court had no occasion to address the interplay between the Carmack Amendment and COGSA, which was the precise issue raised in *Sompo I*. Regrettably, the Su-

preme Court recently dismissed a grant of certiorari in a case that would have squarely presented the issue of which of two federal statutes—Carmack or COG-SA—controls the overland portion of an intermodal shipment. *Altadis USA, Inc. v. Sea Star Line, LLC,* ⎯ U.S. ⎯, 127 S.Ct. 1209, 166 L.Ed.2d 1012 (2007).

The Second Circuit's reading of *Kirby* is not in accord with the law in some other Circuits—in *Altadis,* for example, the Eleventh Circuit reached exactly the opposite result—but this court is bound by *Sompo I* and cannot consider contrary extra-Circuit precedent. I thus reject defendant's argument that *Sompo I* conflicts with *Kirby.*[2]

There is, however, another section of the Interstate Commerce Act, not discussed in *Sompo I,* that defendants argue comes into play in this case.

In December 1995, Congress amended the Staggers Act by adding § 10709 to the Interstate Commerce Act to add a wholly new method for exempting shipments from STB regulation. The relevant portions of the statute provide as follows:

> (a) One or more rail carriers providing transportation subject to the jurisdiction of the Board under this part may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.

> (b) A party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract.

> (c)(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part.

■ Contracts entered into pursuant to 49 U.S.C. § 10709 are expressly made not subject to "this part"—i.e., to Part IV (Interstate Transportation) of the Interstate Commerce Act. Both Carmack (§ 11706) and § 10502(e), which limit the ability of the STB to exempt carriers from Carmack unless they offer shippers the alternative of full Carmack coverage, are found in Part IV of the Act. Therefore, a § 10709 contract is subject to neither section. As a result, carriers entering into § 10709 contracts need not offer full Carmack liability coverage to shippers in order to limit their liability for goods they transport. *Am. Rock Salt Co. v. Norfolk S. Corp.,* 387 F.Supp.2d 197, 200 (W.D.N.Y.2005).

It is undisputed that the contract between UP and Evergreen says on its face that it was entered into pursuant to § 10709. The ERTA incorporates the MITA–2, and the MITA–2 specifically states that it was made pursuant to § 10709. Therefore, UP and Evergreen argue that Carmack is inapplicable here, regardless of *Sompo I.*

*Sompo I* does not address this argument. The Second Circuit did not mention § 10709 even once in *Sompo I.* Neither did the District Court (Duffy, J.) in its original decision. In fact, the issue does not appear to have been raised in *Sompo I* until after that case was remanded by the Second Circuit. At that point, UP attempted to argue that § 10709 trumped the application of Carmack. However, this court could not consider the argument be-

**2.** Since this point is obvious, I assume defendants raised their Kirby argument simply to preserve it in the event governing Second Circuit law changes (by virtue of some pronouncement from the Supreme Court).

cause of the mandate rule.[3] *Sompo Japan Ins. Co. v. Union Pacific Railroad Company,* 2007 WL 2230091 at *4 (S.D.N.Y. Aug. 2, 2007) (appeal pending). Therefore, I am not precluded by *Sompo I* from considering the merits of UP's argument.

However, the argument has no merit.

In another case involving Sompo as subrogee and a rail carrier, Judge Chin of this court had occasion to consider the interplay between § 10709 and Carmack. *Sompo II.* He concluded that Carmack applied to the rail portion of the intermodal carriage at issue in his case, despite the shipping company's attempt to limit liability by invoking § 10709. The primary basis for Judge Chin's ruling was that the contracts in his case—Intermodal Transport Agreements between the shipping company and the rail carrier (Norfolk Southern)—were not § 10709 contracts:

> Section 10709 is not mentioned in the ITAs. It is not mentioned in the bills of lading, the Miscellaneous Waybills, the NSR Rules Circular # 2, or the KCSRC Rules Circular. Defendants have not offered any evidence that these contracts were entered into pursuant to § 10709 or that there was a meeting of the minds between the contracting parties that § 10709 governed the agreements.

*Sompo II,* 540 F.Supp.2d at 497. No such ruling could be made here. The contract between UP and Evergreen states on its face that it is subject to the MITA–2A and the MITA 2–A states on its face that it is governed by § 10709.

■ But the mere fact that the underlying contract between UP and Evergreen falls within § 10709 does not mean that UP managed to limit its liability to Asmo,

plaintiff's subrogor. It is undisputed that Asmo was not a party to the contracts between UP and Evergreen; Asmo was never shown either the ERTA or the MITA 2–A that is referenced therein; the terms of those documents were not disclosed to it; and the sea waybill (which evidences the contract between Asmo and Evergreen) does not say one word about § 10709. The question this court must answer is whether the following statement that appears on the reverse side of the sea waybill at Section 5(D)—"[T]he liability of the Carrier [Evergreen to Asmo] shall under no circumstances whatsoever be greater than that of the Sub-contractor [UP] under said Sub-contractors' contract with the Carrier . . . ."—incorporates the MITA 2–A, with its specific reference to § 10709, into the contract between Evergreen and Asmo (which is evidenced by the sea waybill).

The answer is no. Not only does the sea waybill fail to disclose the terms of the ERTA (and the MITA that it incorporates), it does not even disclose the fact that there was a contract between Evergreen and UP! Rather, it states, *"[I]n the event there is a private contract between the Carrier and a Sub–Contractor,* responsibility for such Through Transportation will be governed by the terms and conditions of said contract which shall be incorporated herein. . . ." (Emphasis added). As this court concluded on remand in *Sompo I,* the sort of five-times-removed-incorporation-by-reference, to a contract whose existence is purely hypothetical as far as the shipper is concerned, fails to charge the shipper with notice of what it is that he is "agreeing" to, and cannot be relied on to bind the shipper. *Sompo Japan Ins. Co.*

---

**3.** I became familiar with the record in Sompo I because, when the case remanded by the Second Circuit, it ended up on the docket of the late Judge Richard Conway Casey rather than on Judge Duffy's docket. When Judge Casey died, I inherited most of his civil docket—which is how I ended up deciding *Sompo I* on remand.

*v. Union Pac. R.R. Co.*, No. 03 Civ. 1604(CM), 2007 WL 2230091, at *5 (S.D.N.Y. Aug. 2, 2007); *see also, Sompo Japan Ins. Co. v. Union Pac. R.R. Co.*, No. 02 Civ. 9523(DAB), 2007 WL 4859462, at *5 (S.D.N.Y. Sept. 26, 2007); *Sompo II*, 540 F.Supp.2d at 500. Such a conclusion is compelled by the longstanding rule that contractual provisions purporting to limit a carrier's liability are enforceable only if they are reasonably communicative so as to result in a fair, open, just and reasonable agreement. *Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 59–60 (2d Cir.2000).

There is no dispute that absolutely nothing was communicated to the shipper, Asmo, about the purported applicability of § 10709 to its shipment. Defendants try to place the blame for this on Asmo, for failing to request a copy of the MITA (which it knew nothing about) or any other contract that might exist between Evergreen and its unidentified subcontractor (there is no evidence that UP's identity was disclosed to Asmo before the shipment was made). But that ignores a critical fact: Evergreen had an affirmative contractual obligation to advise Asmo that the agreement between UP and Evergreen was a private contract governed by § 10709. The MITA–2 required Evergreen to tell Asmo of "all the provisions, restrictions and limitations contained in the MITA." But the fact that Evergreen had an affirmative duty to UP to disclose the terms of the MITA gives the lie to defendants' contention that the onus was on Asmo to request disclosure.[4]

Because Asmo is not a party to any contract made pursuant to § 10709, UP's

liability to Mitsui is not affected by that section. As a result, I need not address whether full Carmack liability coverage has to be offered to shippers who *are* parties to § 10709 contracts. Although it was not strictly necessary, Judge Chin ruled, in the alternative, that a § 10709 shipper was bound to comply with Carmack—even though the literal language of § 10709 took such contracts out of STB jurisdiction and rendered all of Part IV (including Carmack) inapplicable. It is far from certain that I would reach the same result if I were to reach the question; at first blush, I do not see any necessary inconsistency between §§ 10502(e) and 10709, as he did. But as I need not decide this thorny issue in order to dispose of the case before me, I decline to opine on it.

■ UP next argues that Evergreen's "offer" of full liability coverage to Asmo fulfilled any obligation it might have under Carmack. But Evergreen did not offer Asmo Carmack coverage, at least as defined by the Second Circuit in *Sompo I*. There, the court stated that a carrier had to offer the shipper "the option of coverage for the actual loss or injury to the property" (*see Sompo I*, 456 F.3d at 60). All that was "offered" here was the opportunity to declare the nature and value of the shipped goods and thereby become entitled to "higher compensation" (whatever that means). In *Sompo I*, the Second Circuit observed that "Carmack coverage" means that the carrier *must* cover "the actual loss or injury to the property," regardless of its own negligence or lack of negligence. 49 U.S.C. § 11706(a); *see also Sompo I*, 456 F.3d at 59. The sea waybill

---

4. Mitsui, the plaintiff here, cannot bring an action for Evergreen's breach of its duty to disclose, because that obligations is spelled out in the contract between Evergreen and UP, to which Asmo was not party. UP can redress that breach by suing Evergreen under their contractual indemnification for "any and all costs associated with Claims or lawsuits alleging a lack of knowledge of the terms and conditions of the provisions of this MITA."

in this case does not provide for such coverage, and so is subject to various defenses that are unavailable under Carmack.

Finally, Evergreen argues that it is not a "rail carrier" as defined by 49 U.S.C. § 10102(5) of the Interstate Commerce Act, and so is not subject to Carmack. I reject that argument.

49 U.S.C. § 10102(5) defines the term "rail carrier" as any person (with exceptions not here relevant) providing common carrier railroad transportation for compensation. 49 U.S.C. § 10102(6) defines "railroad" as including "intermodal equipment used by or in connection with a railroad" and "a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation." 49 U.S.C. § 10102(9) defines "transportation" as, inter alia, "services related to that movement including receipt, delivery .... transfer in transit .... handling, and interchange of passengers and property."

The website for the Port of Los Angeles advertises Evergreen's container terminal, which was built so Evergreen could engage in "dedicated on-dock rail service." The terminal contains four loading tracks, five storage railtracks, dedicated arrival and departure railtracks, and a dedicated railtrack for switching between loading and storage tracks. (Mazaroli Reply Aff. Ex. 17) Those railroad facilities are used in connection with the transfer in transit of shipments carried by Evergreen ships to rail carriers like UP. Therefore, for purposes of the Carmack Amendment, Evergreen, in its capacity as intermodal shipper, is a rail carrier.

If this were insufficient to prove the point, UP's Business Director, Daniel Hartmann, agreed that "Evergreen provides transportation services to its customers, including the services which Union Pacific performs during the rails stage of international intermodal shipments." (Hartmann EBT at 74: 3–6, found at Mazaroli Aff. Ex. 11)

Of course, there is no practical effect on plaintiff from this ruling, as entering judgment against UP for the full amount of plaintiff's subrogor's damages will effectively end the case. However, Evergreen cannot wiggle out of its liability to UP on the ground asserted.

### Conclusion

As UP has admitted liability and there are no defenses to its liability for the entire amount of Mitsui's loss, plaintiff's motion for summary judgment is granted, and the Clerk of the Court is directed to enter judgment for Mitsui as against both defendants, jointly and severally, in the amount of $386,105.70, plus interest as allowed by law, together with the costs and disbursement of this case. Defendants' cross motions are denied. Mitsui has five business days to submit a form of judgment to the Clerk. After judgment is entered, the Clerk shall close the file.