07-1207-cv
Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: August 4, 2008                    Decided: November 6, 2008)

Docket No. 07-1207-cv

_____

REXROTH HYDRAUDYNE B.V.,

*Plaintiff-Appellant,*

−v.−

OCEAN WORLD LINES, INC., COSCO NORTH AMERICAN INC., COSCO AMERICAS, INC. and COSCO
CONTAINER LINES AMERICAS, INC.,

*Defendants-Appellees.*

_____

Before:
        RAGGI, WESLEY, and LIVINGSTON, *Circuit Judges.*

        Appeal from an order of the United States District Court for the Southern District of New
York (Kaplan, *J.*), entered on February 14, 2007, awarding defendants partial summary judgment
and limiting their liability to $13,500 pursuant to the Carriage of Goods by Sea Act, 46 U.S.C.
§ 30701 note sec. 4(5).

        AFFIRMED.

_____

SUSAN SCHNEIDERMAN, Ballon Stoll Bader & Nadler, P.C., New York, New York *for Appellant.*

PETER D. CLARK, Clark, Atcheson & Reisert, North Bergen, New Jersey *for Appellees.*

————————

WESLEY, *Circuit Judge*:

Two years ago this Court examined the interplay of two federal statutes that govern the transport of goods from foreign shores to inland delivery points in the United States. *See Sompo Japan Ins. Co. of Am. v. Union Pac. R.R.*, 456 F.3d 54 (2d Cir. 2006). We concluded that, when a rail carrier is charged with damage to the shipment, its liability is defined by the Carmack Amendment[1] to the Interstate Commerce Act ("Carmack"), 49 U.S.C. § 11706, and that alternative contractual provisions of the accompanying intermodal bill of lading – even when authorized by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 note sec. 7 – are ineffective as to the rail carrier unless they satisfy the requirements set forth by Carmack and the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 (codified at 49 U.S.C. § 11706). *See Sompo*, 456 F.3d at 76.[2] COGSA has the force of federal law at sea ("tackle-to-tackle") but

---

[1] We note the historical coincidence in the release of this opinion nearly 100 years to the day of the notorious death of the Amendment's sponsor – Senator Edward W. Carmack of Tennessee – who was slain in a Nashville gunfight on November 9, 1908. *See* Biographical Directory of the United States Congress, Carmack, Edward Ward, http://bioguide.congress.gov/ scripts/biodisplay.pl?index=C000157; The Tennessee Encyclopedia of History and Culture, Edward Ward Carmack, http://tennesseeencyclopedia.net/imagegallery.php?EntryID=C033.

[2] At the time this lawsuit was filed, COGSA was codified at 46 U.S.C. app. §§ 1300-1315. Congress has since "reorganiz[ed] and restat[ed] the laws . . . in the appendix to title 46," *see generally* Act of Oct. 6, 2006, Pub. L. No. 109-304, 120 Stat. 1485, and COGSA's provisions have been recodified at 46 U.S.C. § 30701 note. For our purposes, there were no substantive

2

is stripped of its statutory power during the land portion of the shipment's journey ("beyond the tackles"). This case presents an interesting variation of the problem presented in *Sompo*: can parties that either provide the ocean portion of the international journey, or play a role in making rail carrier arrangements for the inland leg, employ the contract-based liability protections authorized by COGSA for the inland leg when the injury to the shipment occurs on the inland leg, or are those parties subject to the same Carmack-based liability as that imposed on the domestic rail carrier? We hold that defendants here do not fall within the statutory grasp of Carmack and are therefore entitled to employ the contractual limitations of liability set out in the through bills of lading. Accordingly, we affirm the judgment of the United States District Court for the Southern District of New York (Kaplan, *J.*).

**BACKGROUND**

The material facts are undisputed. On October 24, 2000, Rexroth Hydraudyne B.V. ("Hydraudyne") contracted with Ocean World Lines, Inc. ("OWL") for the transport of cargo consisting of "27 Packages, being totally one set [of] equipment for a six degrees of freedom motion system for a 1900 beech flight simulator" between Rotterdam, the Netherlands, and the ultimate consignee, Training Devices International, Inc. ("TDI"), in Englewood, Colorado, via the Port of Houston. OWL in turn contracted with Cosco Container Lines Co., Inc. ("Cosco Shanghai") to carry the cargo to the Port of Houston. Cosco Shanghai, through its U.S. agent, Cosco North America, Inc. ("Cosco NA"), arranged for inland rail transport from Houston to Colorado by Union Pacific. The cargo reached Houston on November 11, 2000. Two days later,

changes to the statute.

Cosco NA delivered the cargo to Union Pacific for transport to Denver, where it would undergo customs clearance.

On or before November 20, 2000, Hydraudyne instructed OWL to "hold" the cargo and not to release it to TDI, explaining that TDI had defaulted on financial obligations to Hydraudyne. OWL accepted these instructions and undertook to perform. The instructions were relayed to Cosco NA by OWL. The cargo remained at the Union Pacific freight station in Denver until January 5, 2001, when it was released improperly by Cosco Shanghai for delivery to TDI. OWL and the Cosco defendants concede this constituted a breach of the contract of carriage. TDI failed to pay for the cargo, ultimately filing a voluntary proceeding for liquidation under Chapter 7 of the Bankruptcy Code. Hydraudyne lodged a timely claim against the carriers.

The cargo was carried under two contracts of carriage executed on the same day. The OWL bill of lading incorporated the terms of its tariff. It also provided for a $500 per package liability limitation as authorized by COGSA and extended COGSA's reach beyond "the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. § 30701 note sec. 1(e). This provision is known as a period of responsibility clause. *See Sompo*, 456 F.3d at 56. The bill of lading extended the benefit of all its provisions to the agents and subcontractors of OWL (a so-called "Himalaya Clause"). The Cosco Shanghai combined transport bill of lading provided that carriage to or through U.S. ports would be subject to COGSA and also contained a Himalaya Clause. The Cosco Shanghai non-negotiable waybill provided that the shipper accepted all terms and conditions of the combined transport bill of lading, including the package limitation.

In November 2001, while TDI's bankruptcy was pending, OWL commenced an action in the United States District Court for the Southern District of New York against Hydraudyne, Cosco NA, and Cosco Shanghai, seeking a declaratory judgment that would limit OWL's liability to $500 per package as provided under COGSA, or a maximum of $13,500 for 27 packages. Union Pacific was not named as a party in the suit. In April 2002, the parties stipulated to discontinue the action without prejudice. In February 2006, Cosco NA was dissolved and Cosco Container Lines Americas, Inc. ("CCLA") assumed its duties and obligations.

The present action was commenced by Hydraudyne on July 21, 2006, following its recovery of $386,619.19 from TDI's bankruptcy estate, thereby reducing the principal amount of its claim against the defendants to $297,630.81. As before, Union Pacific was not named in the suit.

Defendants moved for partial summary judgment, arguing that as a result of the package limitation provisions contained in the through bills of lading, their combined liability was limited to $13,500. The district court found Carmack inapplicable because it "applies only to certain rail carriers" and "the issue of rail carrier liability is not presented here." *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.*, No. 06 Civ. 5549, 2007 WL 541958, at *2 (S.D.N.Y. Feb. 14, 2007). The court further found that the defendants' "erroneous failure to adhere to the delivery 'hold'" did not "constitute[] such a deviation as to deprive defendants of the package limitation [of COGSA]." *Id.* at *3. Accordingly, the district court granted the defendants' motion for partial summary judgment limiting their liability to no more than $13,500. *Id.* This appeal followed.

**DISCUSSION**

**I**

This case has nothing to do with the conduct or acts of the rail carrier Union Pacific or any other inland carrier. Instead, the defendants consist of a non-vessel operating common carrier (OWL), a vessel operating common carrier (Cosco Shanghai), and its U.S. agent (CCLA). Thus, the present case differs markedly from the circumstances present in *Sompo*. As the district court correctly noted, *Sompo* "addresses the impact of the Carmack Amendment, which applies only to certain rail carriers, to the liability of a rail carrier." *Id.* at *2.

It is clear from *Sompo* that a "contractual provision extending COGSA's terms inland must yield to Carmack" if Carmack is applicable. 456 F.3d at 73. In *Sompo*, a shipper's insurer pressed a subrogated claim for goods damaged during the domestic rail portion of a continuous international shipment against the rail carrier – Union Pacific – that transported the goods on the inland leg of the journey. *Id.* at 55. The district court granted partial summary judgment in favor of Union Pacific, giving effect to a contract for carriage – similar to the provisions in play here – that incorporated COGSA by reference and effectively limited Union Pacific's liability to $500 per tractor. *Id.*

On appeal, this Court determined that Carmack applied to the domestic rail portion of the continuous intermodal shipment and contrary contract provisions were unenforceable. *See id.* at 68, 73. In support of its interpretation of Carmack, the *Sompo* Court stated "Congress's understanding that the boundaries of Carmack's applicability have always been co-extensive with

6

those of the ICC's [Interstate Commerce Commission's] jurisdiction."[3]  *Id.* at 68.  Thus, Carmack covered any carrier subject to the ICC's jurisdiction and did so with the force of law. The Court noted that applying a contractual extension of COGSA to the exclusion of Carmack would "contradict well-established circuit precedent holding that period of responsibility provisions do not have statute-like status and would undermine the text of the statute itself, which explicitly states that COGSA does not affect laws governing the carriage of goods prior to loading and after discharge."  *Id.* at 74-75.  Ultimately, the Court concluded "that the contractual provision extending COGSA's terms inland must yield to Carmack."  *Id.* at 73.[4]  *Sompo* did not address whether Carmack is applicable to those similarly situated to defendants in this case – an intermediary shipping company that agrees to make shipping arrangements for the shipper from

---

[3] In 1887, Congress passed the Interstate Commerce Act ("ICA") and created the ICC. The ICA empowered the ICC to regulate railroad rates, a responsibility that in 1995 Congress transferred to the Surface Transportation Board ("STB").  *See* ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (codified generally at 49 U.S.C. §§ 10101-16106).

[4] *Sompo* distinguished the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004).  In *Kirby*, the Court held that federal law governs the interpretation of a through bill of lading consisting of sea and land portions, as long as the sea portions are "substantial."  *Id.* at 27.  The cargo owner, Kirby, argued that the bill of lading should be interpreted under state agency law principles such that the railroad could not receive the benefits of the period of responsibility provision.  *Id.* at 21-22.  The Court found that, although the bill of lading covered carriage by both land and sea, it was nevertheless a maritime contract to which federal law applied.  *Id.* at 23-27.  The Court explained that in applying federal law it was avoiding the "[c]onfusion and inefficiency [that] will inevitably result if more than one body of law governs a given contract's meaning."  *Id.* at 29.  The Court also noted that, by applying a single body of law to the contract, it was "reinforc[ing] the liability regime Congress established in COGSA."  *Id.*  *Sompo* was careful to note that the cargo owner in *Kirby* "failed to raise the issue of Carmack's applicability."  *Sompo*, 456 F.3d at 74.  Thus, while *Kirby* is useful in determining if a bill of lading is governed by federal law as opposed to state law, it did not answer how to resolve two seemingly competing federal statutes, which was the issue in *Sompo*.

7

receipt to delivery (OWL), an ocean carrier that provides the ocean passage (Cosco Shanghai), or that carrier's agent that arranges rail carriage for the inland leg (Cosco NA, now called CCLA). *Sompo* establishes that Carmack trumps a conflict between itself and a contractual extension of COGSA inland for transports covered under Carmack. It does not, however, answer the dispositive question in this case: does Carmack also define the liability for the defendants presented here when losses to the shipment occurred on the inland leg of a continuous international shipment? The answer is no.

As in *Sompo,* the plain language of Carmack is dispositive here. The plaintiff fails in its attempt to draw the defendants within the jurisdiction of the Interstate Commerce Act, and subsequently the Carmack Amendment. Specifically, we cannot agree with the plaintiff's contention that the defendants qualify under Carmack as "rail carriers" subject to STB jurisdiction. *See* 49 U.S.C. § 10102(5) (defining "rail carrier" as "a person providing common carrier railroad transportation for compensation, but does not include street, suburban, or interurban electric railways not operated as part of the general system of rail transportation"); *id.* § 10501 (setting forth when transportation by rail carriers is subject to the Carmack Amendment).[5]

The Federal Maritime Commission (FMC), and not the STB, regulates ocean shipping between the United States and foreign countries pursuant to the Shipping Act of 1984. *See* 46

---

[5] To the extent that the parties raise this issue on appeal, we also conclude that none of the defendants are subject to the STB's jurisdiction over water carriers as defined by Carmack. *See* 49 U.S.C. § 13102(26) (defining "water carrier" as "a person providing water transportation for compensation"); *id.* § 13521 (setting forth when transportation by water carriers is subject to the Carmack Amendment); *see also* note 6 *infra*.

U.S.C. §§ 40101-44106; *Transpacific Westbound Rate Agreement v. Fed. Mar. Comm'n.*, 951 F.2d 950, 951 (9th Cir. 1991).  Both OWL and Cosco Shanghai are "common carriers" under the Shipping Act as they held themselves out to the general public to provide transportation by water between the United States and a foreign country, assumed responsibility from the point of receipt to the point of destination, and utilized for all or part of the transportation, a vessel operating on the high seas.  *See* 46 U.S.C. § 40102(6).  Specifically, Cosco Shanghai is an "ocean common carrier" as it is a "vessel-operating common carrier" ("VOCC").[6]  46 U.S.C. § 40102 (17).  OWL is a "non-vessel-operating common carrier" ("NVOCC")[7] because it is a common carrier that "does not operate the vessels by which the ocean transportation is provided" and "is a shipper in its relationship with an ocean common carrier."  46 U.S.C. § 40102(16).[8]  Thus, in their

---

[6] Although one might think that, because the term "water carrier" includes carriers that transport goods over water under the Interstate Commerce Act, Cosco Shanghai could be viewed as a water carrier.  However, Cosco Shanghai's transportation of the cargo at issue here is nevertheless outside the scope of the Carmack.  For transportation "by water carrier or by water carrier and motor carrier . . . when the transportation is by water carrier from a place outside the United States," the Carmack Amendment only applies if "the transportation is provided by water carrier from a place in the United States to another place in the United States after transshipment to a place in the United States from a place outside the United States."  49 U.S.C. § 13521(a)(3)(C).  In this case, Cosco Shanghai provided transshipment from the Netherlands to Houston and not between two points within the United States after the international leg of the journey.

[7] "NVOCCs operate as middlemen; they arrange for relatively small shipments to be picked up from shippers, consolidate the smaller parcels, and ship them via a carrier or several carriers.  They do not, however, own or charter the ships that actually carry the cargo." *Ins. Co. of N. Am. v. S/S Am. Argosy,* 732 F.2d 299, 301 (2d Cir. 1984).

[8] "The contract of carriage with Cosco Shanghai identified Ocean World Lines GmbH ('OWL GmbH') as 'Shipper' and OWL as 'Consignee,' which had the effect of giving OWL GmbH the exclusive right to give instructions concerning the handling of the cargo." *Rexroth Hydraudyne*, 2007 WL 541958, at *1.

9

respective capacities as an NVOCC and a VOCC, both OWL and Cosco Shanghai are subject to the jurisdiction of the FMC, not the STB.[9]

Hydraudyne's argument that the defendants are "'rail carriers' for the purpose of Carmack," Brief of Plaintiff-Appellant at 12, is premised not on the language of the statute, but rather on a district court case interpreting it. In *Kyodo U.S.A., Inc. v. Cosco North America, Inc.*, No. 01-CV-499, 2001 WL 1835158 (C.D. Cal. July 23, 2001), the district court imposed Carmack-based liability for damage to the shipment during the inland leg of the journey on an ocean carrier that issued a through bill of lading. Plaintiff Kyodo alleged that the defendants accepted Kyodo's shipment for carriage from Mexico to Japan, via Long Beach, California. *Id.* at *1. Inland carriage of cargo from Mexico to California was conducted by 10-4 Transport, an inland motor carrier[10] that was not named as a party in the action. *Id.*

The *Kyodo* defendants claimed that Cosco's bill of lading contained a forum selection clause which mandated that all "disputes arising under or in connection with th[e] bill of Lading" be heard in China. *Id.* The district court first observed that the foreign forum selection clauses contained in bills of lading "are generally enforceable under COGSA," *id.* at *2, but noted that "the Carmack Amendment essentially prohibits enforcement of forum selection clauses . . . . As

_____

[9] Hydraudyne did not contest OWL's contention in its Rule 56.1 Statement of Material and Undisputed Facts that it is licensed by the FMC as an NVOCC. *See* Joint App. at 109, ¶ 12. Moreover, Hydraudyne characterizes OWL as an NVOCC in its own brief before this Court. *See* Brief of Plaintiff-Appellant at 9.

[10] Although *Kyodo* deals with an inland motor carrier and interprets the relevant Carmack motor carrier statutes – 49 U.S.C. §§ 14706, 13501 – *Sompo* instructs that "the post-codification language governing the [STB's] jurisdiction, and therefore Carmack's applicability, is identical regardless of the mode of transport." *Sompo*, 456 F.3d at 68 n.13.

10

such, the enforceability of the foreign forum selection clause at issue in this case turns on whether COGSA or the Carmack Amendment governs [d]efendants' liability in this case." *Id.* at *3 (citations omitted). There was no doubt that the motor carrier's obligations were covered by Carmack; the question was whether Carmack also governed the liability of the ocean carrier on the basis that the ocean carrier issued a through bill of lading and the damage to the goods occurred during the inland leg.

The court noted that Carmack "makes an interstate common carrier liable 'for the actual loss or injury to the property' it transports within the United States." *Id.* at *3 (quoting 49 U.S.C. § 14706(a)(1)). The court then looked to a number of well-known Supreme Court cases to probe the underlying purpose of the Amendment, namely to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Id.* (internal quotation marks omitted) (quoting *Reider v. Thompson*, 339 U.S. 113, 119 (1950)). The court reasoned that, "[c]onsistent with this purpose, the Carmack Amendment 'create[s] in the initial carrier unity of responsibility for the transportation to destination.'" *Id.* at *4 (alteration in original) (quoting *Mo., Kan., & Tex. Ry. Co. of Tex. v. Ward*, 244 U.S. 383, 386 (1917)). The district court then determined that, to ensure unity of responsibility, the application of Carmack must turn on the "nature of the shipment" rather than on the "character of the carrier." *Id.* at *4-*5.[11] "[T]he Carmack

[11] *Kyodo* relied on another district court case, *Canon USA, Inc. v. Nippon Liner System, Ltd.,* No. 90 C 7350, 1992 WL 82509 (N.D. Ill. Apr. 17, 1992), but stretched the import of *Canon*. That unpublished decision did not directly address the issue of Carmack applicability to ocean carriers. Instead, the district court in *Canon* stated – without discussion – that the ocean carrier would be liable under Carmack as a "receiving carrier," and then engaged in a lengthy discussion concerning the ICC's jurisdiction over the shipment in question under the

Amendment's jurisdiction over a particular carrier should be determined by reference to the statute's jurisdiction over the particular shipment at the point where the alleged damage occurred." *Id.* at *5.

*Kyodo*'s reliance on general pronouncements concerning the statute's purpose, found in cases such as *Ward*, reflects the danger of parsing a statement of statutory purpose from a case by separating its holding from its moorings of fact and law. *Ward* involved claims against three rail carriers each of which provided a portion of an interstate rail journey of a herd of cattle from Texas to Oklahoma. *See Ward*, 244 U.S. at 384-85. The first rail carrier issued a through bill of lading limiting liability to damage to the cattle that occurred on its own line; the second rail carrier issued a separate bill of lading with its own set of terms and conditions, under which the third carrier also accepted the shipment. *Id.* at 385-86. Justice Brandeis, in his careful but brief opinion, noted that under Carmack a receiving carrier (the railroad that received the cattle and started the journey) was responsible for the whole carriage and each subsequent carrier was bound by the through bill issued by the receiving carrier, the liability terms of which were dictated by Carmack. *Id.* at 386-87. The Court then articulated the well-known phrase that the purpose of Carmack was to "relieve shippers of the difficult, and often impossible, task of determining on which of the several connecting lines the damage occurred." *Id.* at 387. To accomplish that goal, Carmack required that the initial rail carrier be treated as the principal of all

___

"continuation of foreign commerce" provision. *See id.* at *6. The ocean carrier in *Canon* had contractually agreed to answer for any damage caused by the United States carriers handling the United States leg of the international shipment. The summary decision is appropriately limited to its stated conclusion: "that [the ocean carrier] is contractually liable to [the shipper] to the same extent that [the domestic motor carrier] is contractually liable to [the shipper]." *Id.* at *5.

12

those carriers that followed, who in effect became its agents. *Id.* at 387-88. It was in this context that the *Ward* Court employed the idea that the initial rail carrier (*i.e.*, the receiving carrier) had a unity of responsibility for the transportation of goods to their delivery.

*Kyodo*, however, attempts to convert that declaration of statutory purpose into an interpretive premise for the application of Carmack to modern intermodal international shipments without legislative alteration. *Ward* has nothing to do with the interplay of COGSA (which came on to the scene much later) and Carmack. To unleash the general language of *Ward* and similar cases,[12] applying it as a general principle today, glosses over the plain language of Carmack and ignores the complexities introduced into this context by COGSA and a commercial world grown smaller.[13]

Carmack defines the responsibilities of carriers subject to its command while carrying loads covered by the Act. The inquiry is always binary: 1) is the shipment covered by the Amendment; and 2) is the carrier covered by the Amendment? *Kyodo*'s view of the statute, however, ignores this crucial distinction and focuses solely on the nature of the shipment. Thus, under the *Kyodo* court's reasoning, if a shipment falls within the definition of covered journeys,

---

[12] *See, e.g.*, *St. Louis, Iron Mountain, & S. Ry. Co. v. Starbird,* 243 U.S. 592, 595-97 (1917); *Ga., Fla., & Ala. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 194-195 (1916); *Kan. City S. Ry. Co. v. Carl*, 227 U.S. 639, 648-49 (1913); *Adams Express Co. v. Croninger*, 226 U.S. 491, 503-04 (1913); *Atl. Coast Line R.R. v. Riverside Mills*, 219 U.S. 186, 196 (1911).

[13] Indeed, recognizing this changed landscape, the Supreme Court in *Kirby* noted, "[t]he international transportation industry clearly has moved into a new era – the age of multimodalism, door-to-door transport based on efficient use of all available modes of transportation by air, water, and land." 543 U.S. at 25 (internal quotation marks omitted) (quoting 1 T. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 589 (4th ed. 2004)).

Carmack would apply to *all* carriers regardless of their roles in the transport. *Kyodo* would extend the reach of the statute without Congress lifting a finger – a result we cannot accept. In our view, such a judicial expansion of Carmack to include ocean carriers and their intermediaries when not explicitly covered under the statute would not only be unwarranted, but inconsistent with another federal law, *i.e.*, COGSA, which permits the contractual liability limitations at play in this case.[14]

At oral argument, Hydraudyne embraced *Swiss National Insurance Co. v. Blue Anchor Line*, No. 07 Civ 9423, 2008 WL 2434124 (S.D.N.Y. June 10, 2008), a recent decision in the Southern District of New York, as additional support for its argument. In *Blue Anchor*, the district court found that Carmack applied to exclude the COGSA $500 per package limitation of liability contained in the bill of lading. *Id.* at *4. Although the defendant in *Blue Anchor* was, like OWL, an NVOCC, the district court did not address the statutory provisions of Carmack to

---

[14] Our decision in *Project Hope v. M/V IBN SINA,* 250 F.3d 67, 72-76 (2d Cir. 2001), does not require a contrary conclusion. *Project Hope* clearly and correctly notes that the initial stateside leg of an international journey is covered by Carmack even if it is intrastate. *Id.* at 74. In reaching this conclusion, the decision notes that the NVOCC, Blue Ocean, made all the transportation arrangements for the shipper, Project Hope, and at the district court, was held jointly and severally liable for damage to the shipment that occurred before the load was placed on the ocean carrier's vessel. *Id.* at 72. The district court, however, never expressly determined whether Carmack or COGSA governed Blue Ocean's liability; rather, it concluded that the plaintiff made out a case against Blue Ocean under either statute. *See* 96 F. Supp. 2d 285, 291-93 (S.D.N.Y. 2000); *see also* 250 F.3d at 73 n.6. Moreover, Blue Ocean's only argument against Carmack liability was that it was entitled to the COGSA-authorized liability protections of the bill of lading issued not by it, but by the ocean carrier. *See* 96 F. Supp. 2d at 296-97. The district court rejected that argument and found that Blue Ocean was Project Hope's agent and that Blue Ocean had failed to establish the terms of its own bill of lading. *Id.* In sum, the district court was never asked to determine definitively if Carmack by its terms covered an NVOCC, and since Blue Ocean did not appeal, this Court had no reason to consider the issue.

14

determine if Carmack applied to NVOCCs. Instead, *Blue Anchor* incorrectly characterized *Sompo* as requiring uniformity for liability of carriers on all inland segments of an international shipment. *See id.* at *2. *Sompo* does not impose that uniformity; Carmack does, but it does so only with regard to those carriers – such as rail and motor carriers – that are covered by the statute. Nothing in Carmack precludes contract-based limitations on liability (authorized by COGSA) for carriers not subject to Carmack's command. And although giving defendants the benefit of their bargain might introduce some variety in how entities that play a role in the intermodal shipment of goods around the world are held responsible for the loss, damage, or misdelivery of a shipment on the stateside leg of the journey, that result is compelled by the plain language of federal law. Moreover, there is still uniformity of liability for those carriers most likely to share direct responsibility for the loss since Carmack covers the carriers that provide the inland legs of the continuous journey whether by land or water.[15]

Shortly before the release of this opinion, Hydraudyne submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j) notifying this Court of a recent Southern District of

---

[15] That these carriers may wish to protect themselves contractually from the difference between a COGSA limitation of liability and the Carmack standard by obtaining indemnification agreements with entities like OWL is not precluded by what we decide today. *See Canon*, 1992 WL 82509, at *5. In addition, federal law already allows rail carriers in appropriate instances to obtain COGSA-like concessions from shippers for liability exposure. *See* 49 U.S.C. §§ 10502(e)-(f), 11706(a), (c)(3); *Sompo*, 456 F.3d at 59-60 (recognizing that, under the Staggers Act, certain "exempt" rail carriers may limit their liability under Carmack by negotiating "alternative terms," so long as the shipper is presented with the option of selecting "full Carmack coverage, which includes both the Carmack version of strict liability and full coverage for loss"); *Mitsui Sumitomo Ins. Co. v. Evergreen Marine Corp.*, 07 Civ. 3874, 2008 WL 4369763, at *4 (S.D.N.Y. Sept. 22, 2008).

15

New York case interpreting the definition of "rail carrier" under 49 U.S.C. § 10102(5) that requires some attention. *See Sompo Japan Ins. Co. of Am. v. Yang Ming Marine Transp. Corp.* (*Sompo II*), 07 Civ. 11276, 2008 WL 4330058 (Sept. 24, 2008). In *Sompo II*, the district court held that defendant Yang Ming, an intermediary shipping company that arranged for the rail transportation of cargo, was a "rail carrier" under § 10102(5), even though it did not actually operate a railroad. In reaching this conclusion, the court cited the statutory definition of rail carrier: "[A] 'rail carrier' means a person providing common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5). From the use of the word "providing," the court concluded "that Congress did not intend to restrict liability to only those that *operate* rail lines or trains." *Sompo II*, 2008 WL 4330058, at *4 (emphasis in original). In the court's view, "providing" extended the term "rail carrier" to "those who book or arrange the rail transportation for payment." *Id.*

We note that Hydraudyne did not argue for this particular construction of the statute in its briefs to this Court, nor does it appear to have done so in the district court. Rather, Hydraudyne argues that, because the "injury" occurred on the inland leg, Carmack applies to all entities that arranged or conducted the transport. We have already explained why we find that argument unconvincing. We are, of course, "not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Because this area of the statute is not without its difficulties, we think it appropriate to explain why we do not adopt the construction of "rail carrier" identified in *Sompo II*.

16

The phrase "person providing common carrier railroad transportation" in the definition of "rail carrier," 49 U.S.C. § 10102(5), as well as the phrase "rail carrier providing transportation" in the rail carrier liability provision, *id.* § 11706(a), must be interpreted in reference to the object of those provisions, namely transportation. Carmack defines "transportation" as "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property." *Id.* § 10102(9)(A). "Services" count as "transportation" if they are "related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property." *Id.* § 10102(9)(B). These defining terms construe the word "transportation" more broadly than its plain meaning. At the same time, however, the activities enumerated in the definition indicate that "transportation," as used in Carmack, specifically references operational functions related to the actual movement or storage of property or passengers. The words "[l]ocomotive, car, vehicle, [and] vessel" plainly signal that transportation involves travel. "[W]arehouse, wharf, pier, dock, yard, property, [and] facility" indicate that "transportation" includes places where a shipment may rest from initial receipt to final delivery. "Instrumentality[] or equipment" indicates that anything used to move a shipment qualifies as "transportation." Finally, the "services" that are defined as "transportation" are functions related to moving and storing. While the range of activities included in the definition of transportation is broad, they share one thing in common: the direct handling of the shipment at some time from the receiving point to destination. In contrast, arranging or booking rail transportation does not require any contact with the shipped goods or any performance in the carrying of those goods. Accordingly, we conclude that such activities do not fall under the

17

statutory definition of "transportation." Because "transportation" requires some form of direct involvement in the movement of passengers or property, an intermediary company that only makes arrangements for rail transportation would appear to be performing a function that is fundamentally different from that of the rail carrier that actually does the transporting.

In reaching its conclusion that such intermediaries are, in fact, "providing transportation" as rail carriers, *Sompo II* construes "providing" as encompassing "arranging" or "booking" rail transportation. 2008 WL 4330058, at \*4. The statute's use of "providing" is admittedly ambiguous; the interpretation given in *Sompo II*, however, sweeps too broadly to be workable. Definitions provided in the motor carrier portion of Carmack are instructive. *See* note 9 *supra*. Carmack defines a "broker" as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out . . . as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). If providing, arranging, or negotiating for motor carrier transportation were enough to qualify an entity as a motor carrier, it would be impossible for a broker to be "a person[] other than a motor carrier." *Id.* Similarly, a freight forwarder is defined as "a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation" that, among other things, "uses for any part of the transportation a carrier subject to jurisdiction" under Carmack. *Id.* § 13102(8).[16] Under *Sompo II*'s broad reading of "providing transportation," it is difficult to see how, for example, a freight forwarder could "use[]" a rail or motor carrier for transportation (thus qualifying *itself* as

---

[16] The issue of whether any of the defendants in this case might have qualified as a freight forwarder was not raised before this Court, and therefore we need not consider it.

18

a rail or motor carrier under *Sompo II*'s definition) while also "holding itself out to the general public" as something "other than" a rail or motor carrier. *Id.* To avoid such statutory inconsistencies, we believe the better view is that "providing" transportation as a rail carrier under §§ 10102(5) and 11706(a) entails being actively involved in transporting, or "carrying," the shipper's cargo.

This more constrained interpretation of "rail carrier" is further supported by the statute's identification of the types of rail carriers whose conduct can cause injury giving rise to liability under § 11706(a)(1)-(3), *i.e.*, "the receiving rail carrier," "the delivering rail carrier," and "another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading." *Sompo II* observes that § 11706(a) does not limit liability to the rail carrier who actually causes particular injury. 2008 WL 4330058, at *4. The statute does, however, limit liability to rail carriers providing transportation that receive or deliver the property at issue. 49 U.S.C. § 11706(a).[17] We understand the identification of "rail carriers" who can "cause" injury to be all encompassing, reaching all rail carriers who provide "transportation" as

___

[17] While acknowledging that an entity that merely arranges rail transportation cannot qualify as a "delivering" rail carrier under the express definition of that term given in § 11706(a), *Sompo II* posits that such an entity may be held liable as a "receiving" rail carrier. 2008 WL 4330058, at *6. Though § 11706(a) does not define "receiving" rail carriers, the statutory language also does not support the conclusion that receiving rail carriers are vastly different from delivering ones. To the contrary, the term "receiving" rail carrier appears derived from the first sentence of § 11706(a), which charges a rail carrier to issue a bill of lading "for property *it receives for transportation under this part*." 49 U.S.C. § 11706(a) (emphasis added). This language goes against *Sompo II*'s definition of a receiving rail carrier as including an entity that simply "arranges for [the shipper's cargo] to be received by the railroad operator." 2008 WL 4330058, at *6.

19

that term is defined in the statute. Thus, even if an injured party may, under § 11706, sue a receiving, delivering, or transporting carrier that did not itself cause the damages at issue, it cannot sue an entity that does not thus qualify as a rail carrier providing transportation. In short, we do not construe "[a] rail carrier providing transportation" to include another, separate class of common carriers that do not own or operate rail lines or other equipment used in connection with a railroad.

Our conclusion finds further support in cases that focus on a carrier's ability to carry or operate rail transportation in determining its status as a "rail carrier" under the Carmack Amendment. In *Nevada v. Department of Energy*, 457 F.3d 78 (D.C. Cir. 2006), the Court of Appeals for the District of Columbia emphasized that the "principal test is whether there is a bona fide holding out [as a common carrier] coupled with the ability to carry for hire." *Id.* at 86 (quoting *Hanson Natural Res. Co.—Non-Common Carrier Status—Petition for a Declaratory Order*, Finance Docket No. 32248, 1994 WL 673712, at *14 (S.T.B. Nov. 15, 1994)). The court explained that the "ability to carry" is evidenced by an "an ostensible and *actual movement* of traffic." *Id.* (emphasis added) (quoting *Hanson*, 1994 WL 673712, at *14). In a more recent case, the same court focused on the plaintiff's actual operation of trains to conclude that it was a "rail carrier" under the Amendment even though it did not own the tracks over which it carried passengers. *Am. Orient Express Ry. Co. v. Surface Transp. Bd.*, 484 F.3d 554, 556 (D.C. Cir. 2007). The Seventh Circuit similarly considered the operation of rail transportation as a necessary aspect of a "rail carrier" in *Simmons v. ICC*, 871 F.2d 702 (7th Cir. 1989), which held that a new company that was acquiring a rail line, but had not commenced operations was not yet

a "rail carrier" providing railroad transportation. The dispositive factor was not that the company had not yet held itself out as a rail carrier, but that it had not yet begun its operations: the court concluded that "an acquiring railroad becomes a 'rail carrier' under [Carmack] as soon as it commences operations on the acquired line." *Id.* at 711-12. Such careful inquiry into the operations of the carrier would be unnecessary if the statute admitted the broad construction that appellant urges us to derive from *Sompo II*.

In fact, we have found no appellate authority to support the conclusion that providing rail transportation may also include the activity of arranging for – but not actually performing – rail transportation. The STB itself joins the weight of the case law by similarly limiting its interpretation of "rail carriers" to direct participants in the rail industry. *See, e.g.*, *Ass'n of P & C Dock Longshoremen v. Pittsburgh & Conneaut Dock Co.*, 8 I.C.C.2d 280, 290 (S.T.B. 1992) ("Whether [defendant] is a rail carrier can be effectively determined through the application of two tests distilled from the [relevant] cases: (1) does defendant *conduct rail operations*; and (2) does it 'hold out' that service to the public." (emphasis added)). Accordingly, for the reasons stated, we decline to hold that an entity that merely arranges for rail transportation by a third party rail carrier is itself a "rail carrier" subject to the Carmack Amendment.

We therefore conclude that the district court correctly determined that the Carmack Amendment did not apply to the defendants in this case and that the parties' integration of COGSA's terms, including its damages provision, into their contracts of carriage necessarily limits Hydraudyne's recovery in this case to $13,500.

**II**

Hydraudyne's alternative argument, that the defendants' misdelivery of cargo manifested an "unreasonable deviation" from the contracts of carriage thereby depriving them of the benefit of COGSA's liability limitation, is refuted by our precedent. This Court has consistently "reaffirm[ed] the rule that misdelivery of cargo is not a deviation that bars resort to the protections of COGSA." *B.M.A. Indus., Ltd. v. Nigerian Star Line, Ltd.,* 786 F.2d 90, 92 (2d Cir. 1986) (further noting that, because the principle of quasi-deviation or unreasonable deviation is "arguably inconsistent with COGSA," it is "not one to be extended" (internal quotation marks omitted)). In *Nigerian Star*, we adhered to this rule even though the misdelivery at issue was allegedly a product of corruption or criminality. *See id*. Because the misdelivery in this case was the product of less culpable negligence, we cannot depart from established precedent.

**CONCLUSION**

Accordingly, the order of the district court is AFFIRMED.

22